UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CONGREGATION OF RIDNIK, RABBI MOISHE BERGER, CONGREGATION KOLLEL MEOR YOSEF, RABBI DAVID RIBIAT, CONGREGATION KHAL BOSTON, RABBI ABRAHAM HOROWITZ, and CHAIM CAHAN,

Plaintiffs,

-against-

VILLAGE OF AIRMONT, PHILIP GIGANTE, SEAN MACK, LISA-ANN DIMARSICO-SMITH, VILLAGE OF AIRMONT BOARD OF TRUSTEES, PAUL MARCHESANI, ANTHONY VALVO, PETER BLUNNIE, KEVIN WARBRICK, VILLAGE OF AIRMONT ZONING BOARD OF APPEALS, MARTIN KIVELL, ARTHUR KATZ, CHARLES PICARELLI, LAURIE DIFRANCESCO, SCOTT MEIER, MATT RYAN, LINDA CARBONE, BUILDING DEPARTMENT OF THE VILLAGE OF AIRMONT, LOUIS ZUMMO, MARINO FONTANA, COREY MARTIN, PLANNING BOARD OF THE VILLAGE OF AIRMONT, JOHN CORNELIUS, DOUGLAS WHIPPLE, ANTHONY SANTUCCI, WILLIAM PHILIP, RUSSELL HOCK, PAVLE LECEI, KEN BREZNER, SUZANNE CARLEY, COMMUNITY DESIGN REVIEW COMMITTEE, DAN KRAUSHAAR, EVE MANCUSO, STU TURNER, and SHLOMO POMERANZ,

Defendants.

---

Case No. 18-cv-11533

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Congregation Kollel Meor Yosef, Congregation of Ridnik, Congregation Khal Boston, Rabbi David Ribiat, Rabbi Moishe Berger, Rabbi Abraham Horowitz, and Chaim Cahan (collectively, the "Plaintiffs"), by and through their undersigned attorneys, file this Complaint against the Village of Airmont, Philip Gigante, the Village of Airmont Board of Trustees, Paul Marchesani, Anthony Valvo, Peter Blunnie, Kevin Warbrick, the Village of Airmont Zoning Board of Appeals, Martin Kivell, Arthur Katz, Charles Picarelli, Laurie DiFrancesco, Scott Meier, Matt Ryan, Linda Carbone, the Building Department of the Village of Airmont, Louis Zummo, Marino Fontana, Corey Martin, Planning Board of the Village of Airmont, John Cornelius, Douglas Whipple, Anthony Santucci, William Philip, Russell Hock, Pavle Lecei, Ken Brezner, Community Design Review Committee, Dan Kraushaar, Eve Mancuso, Stu Turner and Shlomo Pomeranz (collectively, the "Defendants"), and respectfully allege on information and belief as to all facts other than as to themselves as follows:

## NATURE OF THE ACTION

> *"Congress* [government] *shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"*

1.      In the Village of Airmont, New York ("Airmont" or the "Village"), the act of congregating in a person's home to pray together, study religious texts, or any other religious activity without the Village's approval is a criminal offense punishable by a fine of up to $1,000 per day or a year in jail.

2.      For Hasidic Jews living in Airmont, seeking the Village's approval for religious gatherings places applicants in a process reminiscent of the curse of Tantalus.  At great expense, applicants prepare elaborate plans in order to obtain approval, which the Village uniformly declines to provide.  Instead, the Village dangles promises that the applications will be approved

in the future if certain modifications are made, only to then yank any hope of approval away even after the applicants make the requested modifications.  Instead of providing an approval or denial, the Village requires applicants to satisfy new conditions, often citing purported problems with the applicants' plans on which Airmont officials had already signed-off.

3.      Moreover, if the Village is unable to find a reason not to approve an applicant's plans, it simply refuses to vote on the application until it can generate new conditions for applicants to meet.  In the meantime, applicants are required to pay village officials hundreds of dollars per hour to engage in this never-ending application process.

4.      The Village's process is designed to avoid judicial review by keeping applicants embroiled in a perpetual administrative review until they can no longer afford to proceed or determine that engaging in the process is futile.  As federal courts have recognized, this is nothing new.

5.      Since its incorporation in 1991, Airmont has continuously engaged in a systematic pattern and practice of unlawful discrimination against its Hasidic Jewish residents.  Indeed, as indicated below, Airmont was founded for the specific purpose of discriminating against Hasidic Jews, and, through the years, its Board of Trustees and other government officials have pursued Airmont's anti-Hasidic mission with fervor.

6.      The government conduct here at issue is but the latest example of a custom and practice that began almost 30 years ago.  Over that time it has taken various forms and has been passed down to a new generation of those in power, but the common denominator has been an unwritten government policy to frustrate, fatigue, discourage, delay, deter and deny the rights of citizens to the free exercise of religion and assembly guaranteed by the First Amendment to the

Constitution of the United States.  The discriminatory custom and practice of Airmont and its officials must not be allowed to stand.

## PARTIES

1.      Plaintiff Rabbi David Ribiat is a resident of the Village of Airmont, New York, and the Rabbi of Plaintiff Congregation Kollel Meor Yosef.

2.      Plaintiff Congregation Kollel Meor Yosef is an incorporated association organized under the laws of New York, also known as Congregation Kollel Ohr Yaakov in Airmont, New York.

3.      Plaintiff Rabbi Moishe Berger is a resident of the Village of Airmont, New York, and the Rabbi of Plaintiff Congregation of Ridnik, which is located in Plaintiff Berger's home.

4.      Plaintiff Congregation of Ridnik is an incorporated association organized under the laws of New York, located in Airmont, New York.

5.      Plaintiff Rabbi Abraham Horowitz is a resident of the Village of Airmont, New York, and the Rabbi of Plaintiff Khal Boston, which is located in Plaintiff Horowitz's home.

6.      Plaintiff Congregation Khal Boston is an incorporated association organized under the laws of New York, located in Airmont, New York.

7.      Plaintiff Chaim Cahan is a resident of the Village of Airmont, New York.

8.      Defendant Village of Airmont is a political subdivision of the State of New York, with principal offices located in Airmont, Rockland County, New York.

9.      Defendant Village Board of Trustees of the Village of Airmont is the legislative body of Defendant Village of Airmont, with principal offices located in Airmont, Rockland County, New York.

10.      Defendant Paul Gigante is the Mayor of the Village of Airmont, a member of its Board of Trustees, has an office located at 251 Cherry Lane, Tallman, New York 10982, and was

acting under the color of state and/or Village law during all relevant periods.   Defendant Gigante is sued in his individual capacity and is a resident of Rockland County, New York.

11.     Defendant Paul Marchesani is the Deputy Mayor of the Village of Airmont, a member of its Board of Trustees, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Marchesani is sued in his individual capacity and is a resident of Rockland County, New York.

12.     Defendant Anthony Valvo is a member of the Board of Trustees of the Village of Airmont and was acting under the color of state and/or Village law during all relevant periods. Defendant Valvo is sued in his individual capacity and is a resident of Rockland County, New York.

13.     Defendant Peter Blunnie is a member of the Board of Trustees of the Village of Airmont and was acting under the color of state and/or Village law during all relevant periods. Defendant Blunnie is sued in his individual capacity and is a resident of Rockland County, New York.

14.     Defendant Kevin Warbrick is a member of the Board of Trustees of the Village of Airmont and was acting under the color of state and/or Village law during all relevant periods. Defendant Warbrick is sued in his individual capacity and is a resident of Rockland County, New York.

15.     Defendant Lisa-Ann DiMarsico-Smith is the Village Clerk and Treasurer of the Village of Airmont and was acting under the color of state and/or Village law during all relevant periods.  Defendant DiMarsico-Smith is sued in her individual capacity and is a resident of Rockland County, New York.

16.     Defendant Sean Mack is the Village Attorney of the Village of Airmont and was acting under the color of state and/or Village law during all relevant periods.  Defendant Mack is sued in his individual capacity and is a resident of Rockland County, New York.

17.     Defendant Building Department of the Village of Airmont is the department of the Village of Airmont that is responsible for code enforcement, with principal offices located in Airmont, Rockland County, New York.

18.     Defendant Louis Zummo is a Village Building Inspector of the Village of Airmont, a member of the CDRC, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Zummo is sued in his individual capacity and is a resident of Rockland County, New York.

19.     Defendant Marino Fontana is a Code Enforcer for the Village of Airmont, is responsible for code enforcement in the Village, issued the Notices of Violation at issue in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Fontana is sued in his individual capacity and is a resident of Rockland County, New York.

20.     Defendant Corey Martin is a Code Enforcer for the Village of Airmont, is responsible for code enforcement in the Village, issued violations at issue in this proceeding, and was action under the color of state and/or Village law during all relevant periods. Defendant Martin is sued in his individual capacity and is a resident of Rockland County, New York.

21.     Defendant Planning Board of the Village of Airmont, New York is a village planning board duly organized under the laws of the State of New York, with principal offices located in Airmont, Rockland County, New York.

22.     Defendant John Cornelius is a member of the Planning Board and was acting under the color of state and/or Village law during all relevant periods.  Defendant Cornelius is sued in his individual capacity and is a resident of Rockland County, New York.

23.     Defendant Doug Whipple is a member of the Planning Board and was acting under the color of state and/or Village law during all relevant periods.  Defendant Whipple is sued in his individual capacity and is a resident of Rockland County, New York.

24.     Defendant Anthony Santucci is a member of the Planning Board.  Defendant Santucci is sued in his individual capacity and is a resident of Rockland County, New York.

25.     Defendant William Philip is a member of the Planning Board and was acting under the color of state and/or Village law during all relevant periods.  Defendant Philip is sued in his individual capacity and is a resident of Rockland County, New York.

26.     Defendant Russell Hock is a member of the Planning Board and was acting under the color of state and/or Village law during all relevant periods.  Defendant Hock is sued in his individual capacity and is a resident of Rockland County, New York.

27.     Defendant Pavle Lecei is an ad-hoc member of the Planning Board and was acting under the color of state and/or Village law during all relevant periods.  Defendant Lecei is sued in his individual capacity and is a resident of Rockland County, New York.

28.     Defendant Ken Brezner is an ad-hoc member of the Planning Board and was acting under the color of state and/or Village law during all relevant periods.  Defendant Brezner is sued in his individual capacity and is a resident of Rockland County, New York.

29.     Defendant Suzanne Carley is the clerk of the Planning Board and was acting under the color of state and/or Village law during all relevant periods.  Defendant Carley is sued in her individual capacity and is a resident of Rockland County, New York.

30.     Defendant Village of Airmont Zoning Board of Appeals is a village zoning board of appeal duly organized under the laws of the State of New York, with principal offices located in Airmont, Rockland County, New York.  The Village Zoning Board of Appeals issued one or more determinations that are challenged in this proceeding.

31.     Defendant Martin Kivell is the Chairperson of the Village of Airmont Zoning Board of Appeals, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Kivell is sued in his individual capacity and is a resident of Rockland County, New York.

32.     Defendant Arthur Katz is a member of the Village of Airmont Zoning Board of Appeals, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Katz is sued in his individual capacity and is a resident of Rockland County, New York.

33.     Defendant Charles Picarelli is a member of the Village of Airmont Zoning Board of Appeals, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Picarelli is sued in his individual capacity and is a resident of Rockland County, New York.

34.     Defendant Laurie DiFrancesco is a member of the Village of Airmont Zoning Board of Appeals, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant DiFrancesco is sued in her individual capacity and is a resident of Rockland County, New York.

35.     Defendant Scott Meier is a member of the Village of Airmont Zoning Board of Appeals, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Meier is sued in his individual capacity and is a resident of Rockland County, New York.

36.     Defendant Matt Ryan is an ad hoc member of the Village of Airmont Zoning Board of Appeals, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Ryan is sued in his individual capacity and is a resident of Rockland County, New York.

37.     Defendant Linda Carbone is an ad hoc member of the Village of Airmont Zoning Board of Appeals, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Carbone is sued in her individual capacity and is a resident of Rockland County, New York.

38.     Defendant Community Design Review Committee ("CDRC") is a village zoning board of appeal duly organized under the laws of the State of New York, with principal offices located in Airmont, Rockland County, New York.   The CDRC issued one or more determinations that are challenged in this proceeding.

39.     Defendant Dan Kraushaar is the Village Attorney and a member of the CDRC, which issued one or more determinations that are challenged in this proceeding, and whom was acting under the color of state and/or Village law during all relevant periods.   Defendant Kraushaar is sued in his individual capacity and is a resident of Rockland County, New York.

40.     Defendant Eve Mancuso is the Village Engineer and a member of the CDRC, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Mancuso is sued in her individual capacity and is a resident of Rockland County, New York.

41.     Defendant Stu Turner is a member of the CDRC, which issued one or more determinations that are challenged in this proceeding, and was acting under the color of state and/or Village law during all relevant periods.  Defendant Turner is sued in his individual capacity and is a resident of Rockland County, New York.

42.     Defendant Shlomo Pomeranz is the Village Fire Safety Inspector and a member of the CDRC, which issued one or more determinations that are challenged in this proceeding, as well as Airmont's fire inspector during relevant periods.  Defendant Pomeranz was acting under the color of state and/or Village law during all relevant periods.  Defendant Pomeranz is sued in his individual capacity and is a resident of Rockland County, New York.

## JURISDICTION AND VENUE

43.     Plaintiffs bring this action for violations of (1) the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq*. ("RLUIPA"), pursuant to 42 U.S.C. § 2000cc-2(a); (2) the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983; (3) the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1985; (4) the Fair Housing Act ("Fair Housing Act," or "FHA"), 42 U.S.C. § 3601 *et seq*.; and (5) Article 1 of the Constitution of the State of New York.

44.     Because Plaintiffs' claims for relief under RLUIPA, the FHA, and the U.S. Constitution arise under federal law, this Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 3613.  This Court has subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

45.     This Court has personal jurisdiction over Defendants because they reside in, are located in, or have committed the acts at issue in this action within the district.

46.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Southern District of New York is a judicial district where a substantial part of the events giving rise to the claim occurred.  More specifically, the Village of Airmont, Rockland County, New York is the situs of the illegal actions that took place in this matter and is located in the Southern District of New York.  Further, many, if not all, Defendants reside within the Southern District of New York.

## FACTUAL BACKGROUND

**A.     Airmont Was Founded and Incorporated for Discriminatory Purposes**

47.     Airmont is located in the Town of Ramapo ("Ramapo") in Rockland County, New York.  In the mid-1980s, prior to Airmont's incorporation, Orthodox Jews who practice Hasidic Judaism began to settle in Ramapo (the "Hasidic Residents").  According to the religious principles and beliefs of the Hasidic Residents, all males over the age of 13 must attend prayer services at least two or three times a day with a "minyan" consisting of at least 10 men.  For Sabbath services on Friday nights and Saturdays, as well as for certain holiday services occurring during the week, it is typical for larger groups of Hasidic Residents to come together for longer prayer services.

48.     Critically, pursuant to their strict religious principles, Hasidic Residents may not drive on the Sabbath and on certain holidays.  Thus, Hasidic Residents require places of worship that are within close walking distance of each of their individual homes.  As driving on the Sabbath and holidays is not an option, Hasidic Residents congregate for all required prayers on those days at the nearby residences of the rabbis in their respective residential neighborhoods.  It is often necessary for these rabbis (or other hosts) to make certain changes to their residences in

order to accommodate their congregations, including redecorating or converting specific rooms in their homes, expanding current space, or adding new rooms to use for prayer or religious meeting.

49.     As the population of Hasidic Residents grew, Ramapo began enacting zoning ordinances that *facilitated* the practice of Orthodox and Hasidic Judaism in Ramapo by accommodating Hasidic Residents in the practice of their religion in accordance with their strict principles and traditions.

50.     Around the same time the Ramapo ordinances were enacted, a group of Hasidic Jews purchased a tract of land in the Ramapo area that is now Airmont and requested similar changes to zoning laws.  In response, however, a group called the Airmont Civic Association, Inc. ("ACA") formed to oppose those requested ordinances and the Hasidic Residents' practice of their religion.  The ACA took specific issue with the proposed Airmont-area ordinances aimed at facilitating "home synagogues."  One ACA meeting flyer asked "WHY DO WE NEED TO INCORPORATE?" and answered for "Zoning control and enforcement."  Another ACA flyer stated that the ACA was "concerned about zoning changes in our neighborhood."  The flyers then became more ominous with Orwellian language: "Only YOU can save your neighborhood!" and "We cannot allow this disastrous abuse of our Master Plan."

51.     In April 1991, in an effort to avoid Ramapo's inclusive zoning laws, the ACA and its leadership incorporated the Village of Airmont.  Through this incorporation, Airmont seceded from the town of Ramapo and became a separate municipality.  Soon after incorporation, Airmont's new Board of Trustees enacted zoning laws that forbade the small religious "home synagogues" that had been permitted by Ramapo.  Specifically, in January 1993, Airmont adopted a zoning code (the "1993 Code") requiring that home professional offices be incidental

and secondary to the residential purpose, not change the residential character of the dwelling, not have evidence of the secondary use other than through an "announcement sign," not occupy more than one-half the ground floor of the dwelling, and not employ more than two persons, including family members residing in the home professional office.  The regulation on its face applied to clergymen.

52.     Indeed, since its incorporation and enactment of this core zoning regulation, Airmont has intermittently admitted that its history is one of blatant discrimination against its Hasidic Residents.  At one town meeting, Robert Fletcher, then ACA president who eventually became a member of the Airmont Board of Trustees, brazenly declared that the purpose of the zoning regulations was to "keep those Hasidics from Brooklyn out of here."   Another ACA leader has been quoted as stating, "I am not prejudice [sic] in any way, shape or form but i [sic] will not have a Hasidic community in my backyard."  At another meeting of the same group, one person was heard to say, "[Y]ou know, let's face it, the only reason we formed this village is to keep those Jews from Williamsburg [a Hasidic Jewish community in Brooklyn, New York] out of here."  Even the mayor of Airmont at the time described Hasidic Jews as "foreigners and interlopers," who were "ignorant and uneducated" and "an insult to" the community.

53.     Sadly, the almost 28 years that have followed Airmont's incorporation are a tale of continuous illegal discrimination and deprivation of the Hasidic Residents' Constitutional rights.  While the Airmont leadership may have recently learned not to make public statements evincing their antisemitism, Airmont's anti-Hasidic sentiment is no less pervasive and damaging. Now, these Plaintiffs, each a Hasidic Resident of Airmont or their congregations, directly and indirectly affected by Airmont's discriminatory acts, petition this Court to yet again (1) provide protection from a Village and its officials bent on discrimination and (2) ensure that Plaintiffs

may exercise their basic right of freedom of religion guaranteed them by the Constitution and laws of the United States.

**B.    The Courts Have Repeatedly Sanctioned Airmont For Its Violations of the Civil Rights of the Hasidic Residents**

54.    Airmont and its leadership are no strangers to the courtroom.  In an oft-repeated cycle, Airmont enacts discriminatory zoning or other regulations that restrict the religious rights of its Hasidic Residents; the Hasidic Residents and/or the United States Department of Justice (the "DOJ") sue Airmont to protect their rights; and Airmont and its incorporators and officers lose the lawsuit and are forced to change the zoning laws.  Then, after the dust settles, Airmont enacts yet another discriminatory regulation, beginning the cycle anew.  Plaintiffs are merely the latest Hasidic Residents forced to seek protection from these activities through the courts.

i.    *Le-Blanc-Sternberg v. Fletcher: Airmont's Attacks on Home Synagogues*

55.    In the early 1990s, in the case of *LeBlanc-Sternberg v. Fletcher,* the DOJ and the Hasidic Residents of the newly incorporated Village sued Airmont, its incorporators, and its officers for zoning laws that restricted the use of private homes for religious gatherings. Ultimately, the Second Circuit found that it would not have been economically feasible for the Hasidic Residents to build a synagogue that met both their religious needs *and* the requirements of the Airmont zoning ordinance.  *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 431, 435 (2d Cir. 1995); *LeBlanc-Sternberg v. Fletcher*, 104 F.3d 355 (2d Cir. 1996). The evidence (including anti-Hasidic publications and statements by the individuals who enacted the zoning ordinances) "amply support[ed] a finding that the impetus [to form the town and implement the Code] was not a legitimate nondiscriminatory reason but rather an animosity toward Orthodox Jews as a group." 104 F.3d at 355 (quoting *LeBlanc*, 67 F.3d at 430-1. *Id.* at 431).  The Second Circuit specifically concluded that Airmont's ordinances violated the Fair Housing Act ("FHA") and the

First Amendment and that it was illegal to enact "a zoning code that was intended to, and would be interpreted to, curtail home synagogues, thereby deterring Hasidic Jews from purchasing homes in many Airmont neighborhoods[.]" *Id.* at 429.

56.     On remand from the Second Circuit, the District Court for the Southern District of New York imposed an injunction providing, in part, that Airmont was prohibited from engaging in any conduct having the purpose or effect of perpetuating or promoting religious discrimination, or denying or abridging the right of any person to equal opportunity on account of religion, including: (i) interpreting any provision of the Airmont zoning code so as to hinder, prevent, or prohibit individuals from peacefully assembling in residential dwellings solely for the purposes of individual or group prayer; (ii) discriminating against any person or group of persons on account of religion in the planning, development, construction, acquisition, financing, operation, or approval of any housing in Airmont; and (iii) taking any action which would make housing unavailable to persons on the basis of religion. *U.S. v. Village of Airmont*, 925 F. Supp. 160, 161 (S.D.N.Y. 1996).

ii.     *U.S. v. Airmont: Airmont's Attacks on Yeshivas, Round One*

57.     In the mid-2000s, Airmont injected itself into the education efforts of its Hasidic Residents by enacting an ordinance prohibiting boarding schools within the city limits. But there was only one school at the center of the controversy – a proposed boarding school for Hasidic Jewish males at least 15 years of age and commonly referred to as a Yeshiva, considered a vital part of Hasidic religious tradition.

58.     The DOJ charged that both on its face and as applied, the Airmont zoning law burdened religious exercise in violation of RLUIPA and discriminated on the basis of religion in violation of both RLUIPA and the FHA. *United States of America v. The Village of Airmont*, 05-cv-5520 (S.D.N.Y. Nov. 12, 2008). That case ended in 2011 with a consent decree whereby

Airmont agreed not to: (1) enact any regulation that imposed a substantial burden on religious exercise; (2) restrict land use on the basis of religion; (3) discriminate based on religion in the purchase, sale, construction, occupancy, or privileges of a dwelling; or (4) coerce, intimidate, or retaliate against a person exercising rights granted by RLUIPA or the FHA.  Airmont further agreed to amend its zoning code to allow construction of the Yeshiva with certain agreed-upon restrictions – but that consent decree expired in 2015.

     iii.      *Central UTA of Monsey v. Airmont: Airmont's Attacks on Yeshivas, Round Two*

     59.      In late 2018, a mere three (3) years after the consent decree expired, Airmont and its officials picked up where they had left off – openly discriminating against the Hasidic Residents. On November 28, 2018, the Central UTA of Monsey and other Hasidic Resident plaintiffs sued Airmont for renewed attempts to block a proposed Yeshiva.  *See Central UTA of Monsey v. Village of Airmont, New York*, 18-cv-11103 (S.D.N.Y. Nov. 28, 2018).  The school had previously operated without interference from Airmont or its government officials as both a summer camp (attendance 600+) and a non-Hasidic-Jewish private school (enrollment 400+). After members of the Hasidic community purchased the school property with the intent of opening a new school for Hasidic Jewish students, however, Airmont and its officials arbitrarily declared that the school could not enroll more than 167 students, temporarily prevented the school from applying for building permits to expand and improve, and articulated a host of phantom issues in order to deny the issuance of building permits once the school would finally be allowed to apply.

C.   **The Instant Complaint Seeks Protection from the Renewed Discrimination by Airmont Against Hasidic Residents Via the Village's Various Zoning Codes and the Application Process Required for the Religious Use of Homes**

i.   *Airmont's 2007 Zoning Code Targeted Hasidic Jewish "Residential Places of Worship"*

60.   In order to further discriminate against Hasidic Residents, Airmont passed a revised zoning code in 2007 designed to limit Hasidic Residents' free exercise of religion in the Village (the "2007 Code"). The 2007 Code created hurdles to the Hasidic Residents' ability to congregate and pray in the homes of their neighborhood rabbis when they are unable to drive to a synagogue or other place of worship. Airmont did this by unconstitutionally regulating so-called "Residential Places of Worship." 2007 Code § 210-12.1(B)(Definitions), entitled "Residential Places of Worship," applied to any "dedicated building, or any part thereof, where a group of people assemble in a congregation to perform acts of religious, praise, honor or devotion." The definition of Residential Place of Worship also "include[s] places where religious instructions, ceremonies, and associated activities of faith are carried out." Per the 2007 Code's definition, then, an individual's home, and use of that home, if other persons meet there to worship, would be regulated by Airmont.

61.   The 2007 Code's requirements were confusing. Although the 2007 Code listed residential houses of worship as permitted by right in Airmont, the Code also called for Village approval for such use. Any residential place of worship that consisted of 1,400 square feet or less required an application for a "site review." Any residential place of worship greater than 1,400 square feet required an application for a "site approval."

62.   The difference between site review and site approval was a difference without distinction from a results perspective: regardless of whether a Hasidic Resident's application qualified for site review or site approval, the application ultimately would be denied. That is,

17

Airmont routinely denied any application by Hasidic Residents for both site reviews and approvals. The only true distinction was the associated cost and number of hoops required to jump through. Site review required compliance with certain onerous procedures before ultimately being denied, but site approval required compliance with even more draconian, arbitrary, and expensive conditions. Given that an applicant seeking site approval would be strung along longer and forced to pay significantly more in fees to the Village, the Village would bend over backwards to ensure that applications qualified for site approval.

63.     To ensure that Hasidic Residents were forced to undergo the doomed-from-the-start-and-even-more-expensive site approval process, in calculating the threshold 1,400 square feet, Airmont would purposefully inflate the space allocated for the residential place of worship by including any area in the home that even minimally touched, however tangentially, any religious activity whatsoever, including bathrooms, hallways, and private studies and libraries, regardless of where in the home they were located. Moreover, there was no valid governmental interest in the 1,400 square foot limitation; it was merely an arbitrary number specifically designed to target Hasidic Residents and increase the amount they had to spend before ultimately restricting their ability to host and gather for group worship in their homes.

64.     As mentioned above, both the site review and site approval application processes for a residential place of worship were onerous. All applications required a request for issuance of a building permit, along with an extremely detailed and expensive-to-compile proposed plan for the use and development of the site by the applicant that must "include details regarding water, sewage, parking, traffic, driveway, fire and emergency, buffering for neighbors, and drainage." 2007 Code § 210-12.1(B)(5). The Village's CDRC, the first stage in the zoning application process, then reviewed the applications for "[i]ssues regarding water, sewage, and

drainage . . . parking, traffic, access, fire and emergency, and buffering from neighbors" as well as to "determine if proper engineering standards have been met."  If approved by the CDRC, the application was only then referred to the Planning Board for analysis of the same issues. 2007 Code § 210-12.1(B)(1)(7).

65.    Significantly, the Village required applicants to work with expensive engineers and architects to assemble the detailed plans *before* receiving any guidance from the CDRC or Planning Board regarding what issues or concerns the Village might have with hosting prayer groups in someone's home.  Unsurprisingly, the plans submitted by Hasidic Residents for residential places of worship were rarely approved: Airmont always found new issues and concerns with each plan, requiring applicants to go back to the expensive drawing board.

66.    The entire application process was needlessly attenuated and completely arbitrary. Though § 210-12.1(B)(1)(6) of the 2007 Code required that applications for residential places of worship be prioritized and reviewed on an expedited basis, Airmont unapologetically refused to comply.  Instead, if either the CDRC or the Planning Board officials determined that "an application for a residential place of worship [was] deficient ***for any reason,***" the entire process would slow to a crawl and the respective body would "provide written notification to the applicant of the basis for the deficiency, along with specific written directions that, if followed by the applicant, [would] cause such application to become acceptable to the CDRC and/or the Planning Board." 2007 Code § 210-12.1(B)(1)(11) (emphasis added).

67.    The 2007 Code stated that applications for residential places 1400 square feet or less should receive a decision from the Planning Board within 62 days.  2007 Code § 210-12.1(B)(9).  However, there was no fixed timetable or deadline for the overall review process with the CDRC to be completed and, in practice, the Village would continue to invent reason

after reason, no matter how trivial or insignificant, to delay approval.  In practice, Airmont, through its building inspector, fire inspector, CDRC, and Planning Board, could and would essentially deny any application by the Hasidic Residents for pretextual reasons and after dilatory review while the applicants spent substantial resources in a futile attempt to comply with the Village's process.

68.     Indeed, any review by and/or meeting before the CDRC or the Planning Board was prohibitively expensive.  Each applicant would spend thousands of dollars on architectural and engineering plans before receiving any guidance from the CDRC or Planning Board and then paid hourly fees to the Village and its consultants to evaluate all applications during the entire artificially stretched-out process.  These hourly fees include $165 per hour for the Village Engineer, $160 per hour for the Assistant Village Engineer, $160 per hour for the Village Planner, $100 per hour for the Assistant Village Planner, and $175 per hour for the Village Attorney.  Moreover, the Airmont Application Checklist for the zoning departments states that "[t]hese fees are subject to change without written notice."  These unpredictable hourly fees accumulated during hearings before the supervisory bodies as well as work done in preparation. Applicants often paid more than $1,000 in fees just for officials to attend a single hearing.  Of course, the Village never required just one meeting.  Applications by Hasidic Residents required meeting, after meeting, after meeting.  Meanwhile, Hasidic Residents incurred thousands of dollars in costs and fees, all for just the privilege to gather together to pray to God in the Village of Airmont.

69.     The Village's goal in all of this was simple: make compliance with Airmont's undefined and arbitrary residential place of worship standards so expensive that the Hasidic

Residents and congregations in Airmont would run out of money or become discouraged and withdraw their applications for approval.

70.     Most egregiously of all, the punishment for inviting guests into one's home and praying without a permit from the Village of Airmont was *a criminal offense*, punishable by a fine of $1,000 per day or up to a year in jail.

ii.     *Airmont's 2016 Moratorium on All Land Use Development Barred Even Applications for Residential Places of Worship*

71.     On September 19, 2016, the Airmont Board of Trustees proposed further interference with the Hasidic Residents' First Amendment rights when it discussed implementing a "building moratorium" while the Board developed a new "comprehensive master plan for the Village." Defendant Laurie DiFrancesco, a member of Airmont's Zoning Board of Appeals and Comprehensive Plan Update Committee, stated that the residential places of worship was one reason Airmont should impose a building moratorium. Airmont's unwritten policy of discriminating against the Hasidic community was the driving force behind Defendant DiFrancesco's statements and each individual defendant's vote to enact the building moratorium.

72.     On February 8, 2017, the Defendant Airmont Board of Trustees passed an interim moratorium, and on March 8, 2017, the State of New York accepted and effectuated the moratorium as Airmont Local Law No. 1 of 2017 (the "Moratorium"). Specifically, the Moratorium suspended the consideration or approval of any development in all zoning districts. In other words, no additional applications for residential places of worship could be submitted.

73.     By its terms, the Moratorium was to last six months, with the possibility of one six-month extension by the Board of Trustees for good cause. By its terms, the Moratorium could not extend beyond a year. Despite these limitations, the Board officials extended the Moratorium three times without following proper procedures, further denying the constitutional

rights of the Hasidic Residents.   After nearly eighteen months, the Moratorium expired on September 4, 2018 when the Village adopted a new zoning code.

    iii.    *Airmont's New 2018 Zoning Code Further Targets Residential Places of Worship*

74.    Airmont's newly-adopted zoning code (the "2018 Code") does nothing more than add a fresh coat of paint over the discriminatory 2007 Code and the Village continues to target the Hasidic Residents' constitutional right to the free exercise of home worship just as before. Instead of addressing the illegal aspects of 2018 Code's prior iterations, the 2018 Code makes superficial changes to the 2007 Code that are intended to sanitize and conceal Airmont's practice of targeting Hasidic Residents.   Moreover, Defendants have demonstrated that they intend to use the 2018 Code in the same discriminatory fashion.

75.    Apparently recognizing that the 2007 Code's facial restriction of "residential places of worship" flagrantly violates the First and Fourteenth Amendment, as well as federal and state law, Airmont changed the subject of the Code's regulation from "places of worship" to "places of assembly."[1]   But, of course, as defined by the Village, a "residential place of assembly" specifically encompasses a home where people come to pray collectively on a regular basis, including Hasidic Residents' home synagogues.   *See* 2018 Code § 210-12.1(B)(2).   In fact, the rebranding in the Village's 2018 Code harkens back to its 1993 Code regulating home professional offices that the Second Circuit has already struck as unconstitutional.

76.    Under the 2018 Code, a residential place of assembly is defined as "an accessory use where organizations or loose-affiliations of likeminded people conduct civic, social *or religious* activities more than three (3) times per month." (emphasis added).   The definition of a "residential place of assembly" as one where meetings occur "more than three (3) times per

---

[1] Apparently unbeknownst to Airmont and its officials, this restriction of the right to freely assemble is itself a violation of the U.S. Constitution (as well as federal and state laws).

month" is specifically targeted towards Hasidic Residents, who Airmont knows must meet three times in just a *single Shabbat* for religious activities, and certainly more than three times per month.

77.     Another notable change to the 2018 Code is that houses of worship are no longer permitted by right, even though other accessory uses like community residence facilities are permitted by right.   Religious places of worship or "places of assembly," even within a residence, are now considered "Special permit uses by Planning Board."  2018 Code § 210-15-18.

78.     As part of the Village's discriminatory plan, Airmont did not even include a grandfathering provision in the 2018 Code, effectively nullifying outstanding applications for residential places of worship under the 2007 Code for which residents had spent thousands of dollars in fees.   This decision not to grandfather existing applications filed before the Moratorium and the adoption of the 2018 Code was purposefully intended to prejudice and discriminate against the Hasidic Residents whose lengthy and expensive application processes had been pending for months or years, with no reimbursement for past expenses.

79.     Under the 2018 Code, Airmont replaced the prior 1,400 square foot threshold with an equally arbitrary 40% threshold: "an accessory use to a single-family detached residence . . . shall not exceed the 40% of the gross floor area of a residence."  2018 Code § 210-12.1(B)(1). Airmont again calculates the relevant area to include "places where associated activities are carried out" – such as "bathrooms, meeting rooms, lobby areas and/or other accessory facilities used primarily in conjunction with the residential place of assembly."  2018 Code § 210-12.1(B)(1).  As before, this purely subjective and arbitrary provision was included to continue to deny applications for residential houses of worship, and to squeeze the available area in a

23

person's own home that they may use for assembly and prayer.  And just as the 1993 Code's requirements that home professional offices occupy no more than one-half of the ground floor of any dwelling were unconstitutional, so too are the 2018 Code's new arbitrary spacing constraints targeting Hasidic Residents' religious assembly.

80.     Moreover, just as the 2007 Code required applicants to receive approval from the CDRC and Planning Board in order to be permitted a "Residential Place of Worship," an applicant must now receive approval from the CDRC and Planning Board in order to be permitted a "Residential Place of Assembly."  2018 Code § 210-12.1(B).  The 2018 Code again requires an applicant to submit highly detailed and prohibitively expensive plans that must "demonstrate compliance with all applicable laws, statutes, rules and/or regulations, including, but not limited to, the New York State Building and Fire Codes," and further provide a "narrative summary" that details "the anticipated number of members, square footage of the residential and worship spaces, days and hours of services, and number of parking spaces provided."  2018 Code § 210-12.1(B)(11), (12).  And just as before, Airmont requires an applicant to pay the excessive and unpredictable "consultant fees" associated with the required CDRC and Planning Board meetings.  2018 Code §§ 210-12.1(B)(14), 210-74(A)(1).

81.     What has changed under the 2018 Code, however, is the removal of the 2007 Code's requirement that applications for residential places of worship were to be prioritized and reviewed on an expedited basis.  Now, while the 2018 Code says that applications for residential places of worship will be given priority in scheduling, hearings, and decisions, it lists no timeline for decision-making.  2018 Code §§ 210-12.1(B)(15).  This means Airmont is free to drag out the review process while it invents new reasons to deny applications to Hasidic Residents, just as

it had done before while operating under 2007 Code, but now without the need to do so while blatantly violating its own timing rules.

82.     To effectuate the Village's discriminatory plan under the 2018 Code, Airmont further interposes a host of new procedural hurdles as well.   First, an application for a "Residential Place of Assembly" must begin with an "informal plan for discussion to the . . . CDRC prior to a formal application for site development plan review," which is not a formal submission and, as such, cannot form the basis for Village approval. 2018 Code § 210-12.1(B)(14), § 210-74(A)(1).   At this informal stage the "CDRC may opine as to whether an application is sufficiently complete to go before the Planning Board for formal review." *Id*.  In other words, although the informal plan cannot form the basis for approval, it can form the basis for rejection.   And just as it did under the 2007 Code, the CDRC can keep engaging in this arbitrary and discriminatory process indefinitely until the Hasidic Residents give up.

83.     Next, if Airmont allows an application for a "Residential Place of Assembly" past the "informal review" gate, the application must then go before a "public hearing on the site development plan," and "[t]he applicant shall notify all owners of real property within 500 feet of the perimeter of the site . . . for the noticing of the public hearing."  2018 Code §§ 210-12.1(B)(14), 210-74(A)(3).  The applicant must pay the costs for issuing written notification of the hearing.

84.     If the application is approved at the public hearing, it then goes before the Planning Board, which, just as before, retains unbridled discretion to approve, deny, or just plain delay an application, and there is no meaningful time restriction for it to render its ruling.  2018 Code §§ 210-12.1(B)(14), 210-74(A)(6).

85.     And as before, Airmont requires that applicants must pay for the costs and fees associated with each and every meeting, costs which remain prohibitively expensive.

86.     Further, Airmont unlawfully regulates how the residential places of assembly can be used stating that, "no space within the residential place of assembly may be… utilized by non-members or used for meetings or functions not directly associated with the approved accessory use."  2018 Code §§ 210-12.1(B)(6).  This means the Village now prohibits its residents from inviting anyone they want into certain spaces within a resident's own home, including "non-members."

87.     In addition, the 2018 Code now prohibits "public baths," which has the effect of banning mikvahs in Airmont.  *See* 2018 Code §§ 210-12.1(B)(5).  A mikvah is a small bath used by members of the Hasidic Jewish community to achieve ritual purity under Jewish law.  Use of the mikvah is typically limited to a single person and an assistant at any given time. By prohibiting public baths in the 2018 Code, Airmont specifically targeted the mikvahs used by Hasidic Jews in Airmont.

88.     Finally, upon information and belief, just as before, failure to comply with the 2018 Code is a *criminal* offense punishable by a fine of up to $1,000 per day or a year in jail.

89.     The new Master Plan under the 2018 Code is the same as under the old ones: to retain the so-called "character" of Airmont by creating sufficient barriers and burdens to the Hasidic Residents' free exercise of religion and to fulfill its unwritten policy to dissuade potential new Hasidic Residents from moving in and force current Hasidic Residents out.  And the Village's anti-Hasidic plan is succeeding.  Members of the greater Hassidic community are staying away due to the blatant anti-Hasidic conduct taken by the Village of Airmont.

D.     **Defendants Have Discriminated Against Plaintiffs Through Application of Airmont's Zoning Codes**

90.    Plaintiffs Congregation Kollel Ohr Yaakov, Congregation of Ridnik, Congregation Khal Boston, Rabbi David Ribiat, Rabbi Moishe Berger, and Rabbi Abraham Horowitz (the "Rabbi Plaintiffs") have all been victims of Defendants' unlimited discretion and power in this so-called "application" process for residential places of worship or assembly.

91.    The Rabbi Plaintiffs' stories share the same basic elements: Rabbi Plaintiffs realize that they need Village approval in order to have neighbors over to pray at their homes; Rabbi Plaintiffs undertake extensive and expensive measures to submit the requisite plans and applications; Defendants continually move the goal posts, repeatedly finding new and different application "deficiencies" or issues that need to be addressed before Rabbi Plaintiffs' plans can be approved; Rabbi Plaintiffs incur mounting fees in an attempt to cure the alleged deficiencies, only to discover issues that prevent their applications from being approved, Rabbi Plaintiffs keep incurring more costs and fees; Rabbi Plaintiffs never get Village approval; and in certain circumstances, Airmont accuses them of criminal conduct for hosting an unauthorized place of worship (even while they are in the middle of the application process) and issues violations that come with fines and threats of jail time.

i.     *Congregation Kollel Ohr Yaakov and Rabbi David Ribiat*

92.    Plaintiffs Congregation Kollel Ohr Yaakov and Rabbi David Ribiat began their exhaustive and never-ending process to obtain Village approval for a residential house of worship more than two and a half years ago.  Rabbi Ribiat had recognized that the small house he had purchased in Airmont was not large enough to host prayer meetings for his neighbors who needed a nearby location to pray.  To meet these needs, as well as the needs of his immediate

family who also required more living space than their home provided, Rabbi Ribiat decided to build an extension to the back of his house that could adequately address both of these needs.

93.    Wanting to comply in all respects with Airmont's code and rules, Rabbi Ribiat began the application process for a residential place of worship under the 2007 Code in March 2016.  With limited funding available and insufficient space in his current home, Rabbi Ribiat and his neighbors had hoped for an expedited application and review process as provided for in the 2007 Code.  Rabbi Ribiat first met with Ian Smith, the Village's former building inspector ("Building Inspector Smith") for an inspection and to discuss the scope and plan for the proposed extension.  At that initial meeting, Rabbi Ribiat provided extensive detail regarding his intention to build a 2,845 square foot extension that included new spaces for both his personal use, as well as space designated for a residential house of worship.

94.    Building Inspector Smith advised that based on his inspection, Rabbi Ribiat would need to apply for a zoning variance because the planned addition was too large when compared to the overall size of his lot.  Rabbi Ribiat explained that although the proposed addition would still have been too small for their needs, he would submit a proposal for a smaller extension to avoid needing a variance from the Village.  Building Inspector Smith noted, however, that Rabbi Ribiat should apply for an extension for the actual size that he needed because Airmont was approving reasonable variances, and Rabbi Ribiat's planned expansion was reasonable to Building Inspector Smith.  Building Inspector Smith was shortly thereafter replaced as Defendant Building Inspector by Lou Zummo ("Building Inspector Zummo").

95.    Based on the inspection and representation of the Building Inspector Smith, Rabbi Ribiat submitted his application on behalf of himself and Congregation Kollel Ohr Yaakov, and had his first meeting with the CDRC on August 9, 2016.  At this meeting, Rabbi Ribiat presented

his plans for a larger addition, which included an engineer's site plans and hand-drawn architectural plans for dedicated spaces for personal and residential house of worship use. Despite the representations from Building Inspector Smith, however, the CDRC informed Rabbi Ribiat that the proposed addition was too large and that he would need to downsize the expansion before he could get approval.  In addition, the CDRC officials demanded that before the proposal could be approved by the CDRC, Rabbi Ribiat would first need to submit complete, professional architectural plans.  Consequently, the CDRC did not approve his application.

96.    All of the CDRC's objections to Rabbi Ribiat's plans were specifically made to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship.  Each CDRC member prohibitively drove up Rabbi Ribiat's costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Ribiat from obtaining approval for his residential place of worship.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC member's actions.

97.    Because the 2007 Code provided for a 62-day expedited review for a residential house of worship of less than 1,400 square feet, Rabbi Ribiat revised the plans to instead propose a residential house of worship of less than that size.  Although Rabbi Ribiat did not want to alter his plans because they neither fully meet his own nor his neighbors' needs, he and his congregation were anxious to expedite the process and get approval from the Village so they could legally meet to pray in Rabbi Ribiat's home.  The new plans additionally included a 1,175 square foot extension for Rabbi Ribiat's private use.

98.    As instructed by the CDRC, Rabbi Ribiat hired an architecture firm at great expense to draft professional architectural plans.  Upon information and belief, the first architect

Rabbi Ribiat attempted to hire would not take on the project because of Airmont's practice of delaying approval of residential houses of worship.  A second architect took the project, but being unfamiliar with the CDRC and the Planning Board, expressed surprise that Rabbi Ribiat was required to first produce architectural plans before any guidance was provided or proposals were approved.  The architect noted that having to create expensive plans at the first instance was "like the tail wagging the dog."  Still, Rabbi Ribiat attempted to follow the CDRC's demands and went forward with plans for a smaller residential house of worship.

99.    On September 13, 2016, Elchonon Ribiat, the son of Rabbi Ribiat and representative of Congregation Kollel Ohr Yaakov met with the CDRC for a second meeting to present them with the new professional architectural plans.  At the meeting, the Village's Engineer informed the representative that due to the topography of Rabbi Ribiat's lot, any addition to Rabbi Ribiat's home would require the significant costly excavation of a foundation and basement, which, if not required to be filled by the Village, could create an additional 1,500 square feet of useable space (and thereby push the application above the 1,400 square foot threshold for site approval).

100.    In addition to adding a new foundation, the CDRC demanded further changes to the architectural plans.  All of the requested changes were initially minor, such as changing the direction of swinging doors, changing the widths of entrances, and adding the precise dimensions of areas in bathrooms.  Airmont's fire inspector Defendant Shlomo Pomeranz ("Fire Inspector Pomeranz"), however, then demanded a major change to the plans: Now every window on the second floor of the building must be made accessible via ground ladder – a requirement that would have rendered two of the proposed parking spaces on the plan unavailable.  A proposed solution was to add an additional costly porch to the plans.

101.    All of the required changes to the plans demanded by the CDRC officials required Rabbi Ribiat to expend additional funds amending the architectural plans and to return to the CDRC for another meeting.  All of the CDRC officials' new demands for Rabbi Ribiat's plans were specifically made to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship.  Each CDRC member prohibitively drove up Rabbi Ribiat's costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Ribiat from obtaining approval for his residential place of worship.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC member's actions. However, operating under the assumption that these plans would be approved by Defendants, as conveyed by the CDRC, Rabbi Ribiat and his congregation moved forward with adjusting the plans and preparing for the next CDRC meeting.

102.    On April 6, 2017, Congregation Kollel Ohr Yaakov's and Rabbi Ribiat's representative returned for a third meeting with the CDRC.  At this meeting, the CDRC found new problems with the proposed revised plan that it had failed to raise at the second meeting. First, the CDRC again took issue with several minor details, including the absence of markings for the precise location of light fixtures and the lack of concrete pads near each door.  Correcting these minor details would again require additional costly revisions to the plans.  Second, the CDRC further required that the plans now include the full elevation of the sides of the house. This requirement was a brand new demand adding yet more costs to the project.

103.    Third, the CDRC now objected to the fact that the planned location for the prayer meeting space in Rabbi Ribiat's home had a door that connected to a proposed personal study for Rabbi Ribiat.  Although the location of the Rabbi Ribiat's personal study was clearly marked on

the plans during the second CDRC meeting, the CDRC officials took issue with it for the first time at this meeting, and objected to Rabbi Ribiat's assertion that the study should not be counted as part of the residential place of worship calculations. Instead, the CDRC believed that in the current iteration of the plans, the personal study should be considered part of the religious meeting space. The difference was significant: By including the study as part of the proposed religious meeting space as opposed to the residential space, the designated space for religious worship would exceed 1,400 square feet, triggering the need for Rabbi Ribiat to obtain Village-approved variances, the compliance with additional building requirements, and yet more delays of the approval process.

104. The CDRC officials stated they would defer to the opinion of Building Inspector Zummo on the issue. After first noting that whether to consider the study as part of the existing residence or part of the religious meeting space was as completely arbitrary as the difference between "potayto" and "potahto," he advised that as long as there was a fire wall and a fire door separating the study from the place of worship, the study would be included in the square footage calculations for the existing residence and not the residential place of worship. The CDRC agreed that if all the recommended changes to the plan were made, Rabbi Ribiat could then proceed with his application to the Planning Board.

105. Taking the CDRC and Building Inspector Zummo at their word, Rabbi Ribiat made additional costly changes to the plans. At this point, Rabbi Ribiat and Congregation Kollel Ohr Yaakov prepared for their first meeting with the Planning Board, hoping that their plan and application would be approved, given that they had now had three meetings with the CDRC and followed all of its recommendations to date.

106.    In advance of the Planning Board meeting, Rabbi Ribiat was further informed that as part of the Planning Board application process, a document called a Long Form Environmental Assessment Form ("EAF") needed to be prepared, even though a Short Form EAF had been previously prepared for the CDRC without objection.  Rabbi Ribiat's engineer informed him that the proposed extension did not meet the threshold for requiring a Long Form EAF, as many of the sections are not applicable and could not be filled out, and was extremely costly to prepare.  However, Rabbi Ribiat's representative had the engineer complete the Long Form EAF to the best of his ability despite the cost in order to comply with the Planning Board's rules.

107.    On the afternoon of the Planning Board meeting on May 25, 2017, Rabbi Ribiat received a barrage of emails from CDRC officials containing comment letters on Rabbi Ribiat's plan.  The comment letters raised a host of brand new issues that had never been brought up at any of the previous three CDRC meetings.  In addition, the letters noted that the Long Form EAF was incomplete.  Finally, the comment letters objected to the number of available parking spaces because the proposed residential house of worship would be 1875 square feet – a number the CDRC reached by including Rabbi Ribiat's personal study as part of the residential house of worship despite the inclusion of the fire wall and fire door as the CDRC had previously deliberated and signed off on.  Upon information and belief, the content and timing of the CDRC officials' comment letters, which were sent mere hours before the start of the Planning Board meeting, was designed to prevent Rabbi Ribiat from meaningfully addressing them before the meeting, and enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship.  The CDRC officials prohibitively changed the requirements for approval and ultimately prevented Rabbi Ribiat from obtaining

approval for his residential place of worship. Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC member's actions.

108.    As designed by the CDRC and the Planning Board, Rabbi Ribiat was unable to get Planning Board approval at the meeting.  The Planning Board and its professionals reviewed all of the negative eleventh hour comment letters from the CDRC and its professionals, notably including letters from CDRC members and professionals who had previously signed off on the plans.  In addition, the Planning Board took issue with incomplete sections of Long Form EAF although completion was impossible because those sections were wholly inapplicable to the project.  But despite pleas from Rabbi Ribiat's representative that they would address all of the Planning Board's concerns, the Planning Board rejected the plans and required additional meetings.   The Planning Board's rejection of the plans and requiring new meetings was specifically intended to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship.   Each Planning Board member prohibitively drove up Rabbi Ribiat's costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Ribiat from obtaining approval for his residential place of worship.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual Planning Board member's actions.

109.    Due to the CDRC's and its professionals' about-face at this meeting, as well as the need to avoid additional costly Planning Board meetings, Rabbi Ribiat's representative instead requested another CDRC meeting to get accurate information from the CDRC's professionals as to what was really required to obtain Planning Board approval.

110.     On June 13, 2017 (more than a year after their initial application was submitted), a representative returned for a fourth and final meeting with the CDRC.  Over protest by the representative, the CDRC officials reversed their previous position regarding Rabbi Ribiat's personal study, and now required that any future plans include the study in the calculations for the residential place of worship. Airmont's unwritten policy of religious discrimination against its Hasidic Residents was the moving force behind each individual CDRC member's decision to renege on the prior commitment and representations to Rabbi Ribiat and Congregation Kollel Ohr Yaakov about the study.

111.     The representative then proposed that in order to be under the 1,400 square foot threshold, Rabbi Ribiat would agree to change the personal study to a bedroom instead, and Rabbi Ribiat would continue to use his existing personal study located in a separate part of the house.  In response, one of the CDRC's officials stated that regardless of where Rabbi Ribiat's study was located in the house, it must be considered part of the residential place of worship because Rabbi Ribiat *might* meet with congregants there.  When the representative stated that Rabbi Ribiat could simply meet with his congregants in the main sanctuary, the CDRC's official responded with "are you going to tell me that [Rabbi Ribiat] will never prepare a sermon in his study?"

112.     Of course, whether Rabbi Ribiat meets with a congregant or prepares a sermon in his is study is irrelevant to whether the space is used as a "residential place of worship" where Rabbi Ribiat's neighbors can meet to *pray*.  The CDRC's focus on Rabbi Ribiat's study was specifically designed to derail the project.  By trying to include it in the calculations for the residential place of worship, Rabbi Ribiat would be required to build more parking spaces. However, there is insufficient space on Rabbi Ribiat's lot for additional parking spaces.

Therefore, Rabbi Ribiat would need to receive a variance from the Village.  The CDRC officials knew this and knew that by going back on their previous agreement regarding the study, the project would be derailed, and they would successfully prevent another residential place of worship application by Airmont's Hasidic Residents in accordance with the Village's unwritten policy.

113.   After further debating the issue, the CDRC officials represented that they would approve a modification of converting the study to a bedroom only if the doorway connecting the place of worship to the proposed bedroom was permanently sealed off and Rabbi Ribiat submitted photographic evidence showing as much.

114.   The CDRC further admitted during the meeting that the Short Form EAF would have been sufficient to submit for Rabbi Ribiat's and Congregation Kollel Ohr Yaakov's purposes.  Significantly, one of the major reasons claimed by the Planning Board officials for rejecting the plan were comment letters from the CDRC officials criticizing the submission of an incomplete Long Form EAF despite the submission of a complete Short Form EAF.  When the representative questioned whether Rabbi Ribiat needed to incur the additional cost of completing the unnecessary Long Form EAF, the Village Planner stated that Rabbi Ribiat must complete the Long Form EAF now because it had already been submitted once.  Upon information and belief, there is no such rule in the Village Code, and the Village's decision required Rabbi Ribiat or Congregation Kollel Ohr Yaakov to spend more money on forms that the CDRC admitted the Planning Board did not need.  Instead, the decision was designed to enforce Airmont's unwritten policy of discrimination against Hasidic Residents by preventing the addition of residential places of worship in Airmont.  Each CDRC member prohibitively drove up Rabbi Ribiat's costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Ribiat from

obtaining approval for his residential place of worship.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC member's actions.

115.    After making plans to assuage these new unfounded concerns, Rabbi Ribiat and his congregation prepared for a second Planning Board meeting on July 27, 2017.  However, yet again, only hours before the meeting, Rabbi Ribiat received new comment letters from the CDRC officials.  This time, the CDRC objected to the plans based on a new interpretation of the 2007 Code to conclude that because of the lot size, the residential house of worship could actually only be a maximum of 967 square feet (as opposed to 1,400 square feet).

116.    Faced with these new issues that would surely result in a second rejection by the Planning Board of the current plans, Rabbi Ribiat and his congregation decided to cancel the Planning Board meeting and regroup.  Significantly, the 2007 Code had not changed since Rabbi Ribiat applied for a residential house of worship.  The content and timing of the CDRC officials' comment letters, which were sent mere hours before the start of the Planning Board meeting and which included an interpretation of the 2007 Code that was never discussed at any previous CDRC meeting, was designed to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship.  Each CDRC member prohibitively drove up Rabbi Ribiat's costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Ribiat from obtaining approval for his residential place of worship.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC member's actions.

117.    In the ensuing weeks after canceling the Planning Board meeting, the CDRC officials informed Rabbit Ribiat and his congregation that they would need to request twelve (12)

variances if they wished to get approval from the Planning Board.  Instead of requesting these variances, which would have inevitably been rejected, Rabbi Ribiat and his congregation spent additional time, effort, and money drafting new plans for the residential place of worship.  Rabbi Ribiat was also now forced to seek legal help and to engage a new site planner in the hope they could make better progress with the Village.

118.   On February 22, 2018, they met for a second time with the Planning Board and presented their new plans.  At this meeting, they received no negative comments regarding the plans.  However, without explanation, the Planning Board did not vote on the application. Instead, the Planning Board advised that Rabbi Ribiat would need to come back for another meeting resulting in additional expense to Rabbi Ribiat and further delay.  The Planning Board's actions indicated that the reason it refused to approve the new plan was to consult Village professionals and/or other Village officials to find new reasons to reject the residential place of worship. This deliberate act by the Planning Board officials delaying approval of the application was meant to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship.  Airmont's unwritten policy of religious discrimination against Hasidic Residents was the moving force behind each individual Planning Board member's delay of approving the application.

119.   On March 29, 2018, Rabbi Ribiat met with the Planning Board for a third meeting.  Despite the new plans having sealed off the room that was formerly a study from the residential place of worship as previously discussed with the CDRC and presented without objection at the second Planning Board meeting, the Planning Board now determined that the study must be considered part of the residential place of worship.  Consequently, because the study was part of the residential place of worship, the Planning Board decided that unless Rabbi

38

Ribiat and his congregation could provide for more parking spaces, their plan could not be approved.  The Planning Board officials' about-face effectively doomed the project as the lot simply has no additional room for parking, forcing Rabbi Ribiat and his congregation to choose between going back to the drawing board yet again or finally giving up.

120.   The Planning Board's reversal of its previous stance and dilatory objections indicated that the approval process was designed to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual Planning Board member's actions.

121.   With little other recourse, Rabbi Ribiat and his congregation made several bold changes to their plans in order to further drive down the square footage of the proposed place of worship and submitted the new plan to the Planning Board in April 2018.  Moreover, in advance of a fourth meeting with the Planning Board, Rabbi Ribiat converted his existing study to a bedroom.  However, after meeting with Planning Board for the fourth time on April 26, 2018, the plans failed to obtain approval yet again.  Despite Rabbi Ribiat's representations, the Planning Board officials insisted that the bedroom would still be used as a study.

122.   After the fourth Planning Board meeting, Fire Inspector Pomeranz called Rabbi Ribiat to demand a fire inspection of Rabbi Ribiat's house.  Fire Inspector Pomeranz objected to changing the use of one of Rabbi Ribiat's rooms from a study to a bedroom, claimed that the change was "illegitimate," and then stated that he simply did not believe that Rabbi Ribiat had converted the room.  As there was no reason for any fire inspection of his home, Rabbi Ribiat declined, but offered to provide a picture.  Incensed that his demand to enter Rabbi Ribiat's home was rejected, Fire Inspector Pomeranz thereafter wrote a scathing comment letter rejecting

the new proposed plan, insisting that the bedroom was still a study, and that the proposed residential place of worship was still oversized.

123.     Upon information and belief, Fire Inspector Pomeranz's demand for a fire inspection was a pretext for him to gain access to Rabbi Ribiat's home and find new reasons to reject the plan.  Fire Inspector Pomeranz's comment letter was designed to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and prevent judicial review of the Board's actions by keeping the application in perpetual limbo. Airmont's unwritten policy of religious discrimination against Hasidic Residents was the moving force behind Fire Inspector Pomeranz's actions.

124.     At that point, it was clear to Rabbi Ribiat and Congregation Kollel Ohr Yaakov that the Planning Board and CDRC officials had dug in their heels and the congregation could not meet the boards' constantly shifting requirements. Moreover, Rabbi Ribiat and the congregation had no more funds left to continue seeking approval.  After more than two years, Rabbi Ribiat and his congregation have paid more than $40,000 in fees and costs seeking Village approval. But due to deliberate actions of the boards and their officers, Rabbi Ribiat and his congregation were forced to abandon their plans to move forward with the addition to Rabbi Ribiat's home and currently do not have a suitable place to gather.

125.     The Village of Airmont achieved what it had set out to do all along: burden the free exercise of religion by Hasidic Residents by preventing the addition of residential places of worship in Airmont. The Village prohibitively drove up costs, burdened the approval process with crushing delays, and ultimately prevented approval for residential places of worship, while also avoiding judicial review of their actions by refusing to issue a final decision on Plaintiffs' application and adding new and conflicting requirements in a piecemeal manner

ii.     *Congregation of Ridnik and Rabbi Moishe Berger*

126.    In July 2015, Plaintiff Rabbi Moishe Berger bought a home in a section of Airmont located west of Cherry Lane, which was a neighborhood that had only recently began to attract members of the Hassidic Jewish community and did not yet have any residential places of worship.  Rabbi Berger's home had been previously owned by former Airmont mayor John Layne.

127.    In August 2015, Rabbi Berger obtained a permit from the Village to build a mikvah in his home's existing three-car garage.  Rabbi Berger's mikvah housed the small ritual bath itself, showers, a changing area, and a hallway.  As Airmont requires residents to replace any finished garages with a new garage, Rabbi Berger subsequently obtained a permit to build a replacement three-car garage at his own expense in the fall of 2015.

128.    In the ensuing months, several of Rabbi Berger's neighbors separately requested to use his home to pray.  Rabbi Berger granted their requests, and since then, he has been offering space in his home's replacement three-car garage to pray daily with his neighbors. Rabbi Berger called his residential place of worship and his neighbors who prayed there: Congregation of Ridnik.  Members of Congregation of Ridnik will only walk to Rabbi Berger's home for Friday night and Saturday Shabbat and holiday services.  During the week, Members of Congregation of Ridnik who drive to his home for prayer park primarily on Rabbi Berger's property.

129.    Shortly thereafter, in December 2015, Rabbi Berger met with the CDRC in an attempt to comply with the 2007 Code's regulations regarding residential houses of worship and to get permission from the Village to continue to use his home as a place of communal prayer and worship for Congregation of Ridnik.  Rabbi Berger was informed that he must present architectural plans to the CDRC that included the use of the space and plan for parking.  As

demonstrated by their later actions, as well as other actions identified herein, the CDRC's officials' demands were made to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and to prevent judicial review of the Board's actions by keeping the application in perpetual limbo.   Each CDRC member prohibitively drove up Rabbi Berger's costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Berger from obtaining approval for his residential place of worship.   Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC member's actions during Rabbi Berger's application process.

130.    Between August 2015 and February 2016, Building Inspector Smith inspected Rabbi Berger's home several times, including the new three-car garage, the original three-car garage with the mikvah, and an area of his home immediately adjacent to the mikvah that Rabbi Berger uses as a library.   Although Rabbi Berger had passed each of these inspections without issue, Building Inspector Smith could not provide a certificate of occupancy until Rabbi Berger obtained final permission to use his home as a residential place of worship from Airmont. Consequently, Rabbi Berger prepared to meet again with the CDRC and Planning Board to obtain the necessary approvals.

131.    In the summer of 2016, however, there were several staffing changes to Airmont's Zoning and Planning department, including the replacement of Building Inspector Smith by Building Inspector Louis Zummo and the replacement of Fire Inspector Ken Weppler with Inspector Shlomo Pomeranz.

132.    In September 2016, Rabbi Berger returned to the CDRC for a second meeting, having made changes to his original application to address the CDRC's original concerns.

Among other things, Rabbi Berger revamped his original plans to include additional parking. In fact, he added three more parking spaces beyond the number the CDRC had previously indicated were necessary. But the CDRC officials found several minor reasons to reject his application, including that they did not like the location of the parking spaces. Consequently, Rabbi Berger was forced to expend additional sums redoing his plans and on yet another CDRC meeting. All of the CDRC demands for Rabbi Berger's plans were pretextual and intended to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and preventing judicial review of the CDRC's actions by keeping the application in perpetual limbo. Each CDRC member prohibitively drove up Rabbi Berger's costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Berger from obtaining approval for his residential place of worship. Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC member's actions.

133.    In December 2016, Rabbi Berger returned to the CDRC for his third meeting with new plans. These plans, however, again failed to satisfy the CDRC officials, who again raised more previously undisclosed issues that could have been raised in the previous meetings. For example, this time Rabbi Berger was told that a sidewalk needed to be included in the plans. He was told to change his plans and return to the CDRC to try his luck again. Consequently, Rabbi Berger was forced to expend additional sums redoing his plans and on yet another CDRC meeting. This piecemeal addition of requirements was designed to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and preventing judicial review of the Board's actions by keeping the application in perpetual limbo. Each CDRC member prohibitively drove up Rabbi Berger's

costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Berger from obtaining approval for his residential place of worship. Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC member's actions.

134.   After making these further changes to his plans, Rabbi Berger returned to the CDRC in April 2017 for his fourth meeting, where he finally obtained CDRC approval and was referred to the Planning Board. In attendance at the April 2017 CDRC meeting was Building Inspector Zummo, who voiced no objection to the referral of Rabbi Berger's application to the Planning Board.

135.   On June 22, 2017, Rabbi Berger met with the Planning Board. There, Building Inspector Zummo, who had just reviewed and approved the plans when they were presented before the CDRC in April, now began to question whether Rabbi Berger could use more than 1,400 square feet of his home for prayer and worship. In calculating the 1,400 square feet, Building Inspector Zummo included not only the new three-car garage where Rabbi Berger and his neighbors prayed, but also the original three-car garage with the mikvah and an area of his home immediately adjacent to the mikvah that Rabbi Berger uses as a library. As such, the Planning Board officials determined that Rabbi Berger would need to meet additional requirements in order to get Village approval and rejected the application. Building Inspector Zummo and the rest of the Planning Board officials' strategy of waiting until the Planning Board meeting to raise new issues with the plans they previously approved demonstrate that each of the Defendants sought to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and prevent judicial review of the Board's actions by keeping the application in perpetual limbo. Each Planning Board

member and Building Inspector Zummo prohibitively drove up Rabbi Berger's costs, burdened the approval process with crushing delays, and ultimately prevented Rabbi Berger from obtaining approval for his residential place of worship.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual Defendant's actions.

136.    Two days later, on June 24, 2017, Rabbi Berger received a Notice of Violation, written by Airmont Code Enforcer Marino Fontana, stating that there had been an unauthorized change of use to his home and that he had not completed the planning approval process.

137.    On July 14, 2017, in response to the Planning Board's failure to approve his application on the grounds that a residential place of worship could not use more than 1,400 square feet of a residence, Rabbi Berger's former lawyer wrote a letter to Building Inspector Zummo challenging this unfounded 1,400 square feet restriction.   The letter received no response.

138.    On August 6, 2017, Rabbi Berger's former lawyer sent another letter requesting a response to the July 14 letter, noting that the 2007 Code required that applications for residential places of worship to be given priority and expedited review.  Airmont did not respond until December 27, 2017, when Building Inspector Zummo sent a letter stating that Rabbi Berger's proposed square footage to use for his residential place of worship was simply too large to be approved by Airmont.

139.    There was no further communication between Airmont and Rabbi Berger until February 14, 2018, when Rabbi Berger received another Notice of Violation written by Code Enforcement Officer, Corey Martin.  This notice stated that (1) Rabbi Berger was in criminal violation of two Offense Codes because he was using his residence as a place of worship without

45

Airmont's approval; (2) he would have to arrange an inspection of his home before March 16, 2018, or he would be required to appear in Airmont Justice Court; and (3) his "violations" were punishable by a fine of up to $1,000 per day or up to a year in jail.

140.    On March 16, 2018, instead of submitting to an intrusive "inspection" of the home, Rabbi Berger's former lawyer sent a response stating that the purported Notice of Violation was defective and illegal under federal law and the U.S. Constitution.

141.    Upon information and belief, with the full support of the Village, Building Inspector Zummo and Fire Inspector Pomeranz routinely engaged in a pattern and practice of harassing and targeting Hasidic Residents by attempting to gain access to and inspect their residences to improperly cite them for criminal conduct, assess phantom violations, demand unnecessary repairs or adjustments, and incur visitation fees.  Because of this, Rabbi Berger did not agree to or schedule the inspection demanded by the Notice of Violation, fearing that it would simply give Building Inspector Zummo or Fire Inspector Pomeranz an additional opportunity to cite him for criminal conduct and/or demand that he make more costly adjustments to his home for any number of purported "violations."

142.    Airmont never responded to this letter.  Instead, three days later, Rabbi Berger received an Appearance Ticket to appear in Airmont Justice Court on June 7, 2018.  The Appearance Ticket also called for an inspection of his home.

143.    Defendants' actions reveal that the multiple Notices of Violation and Appearance Ticket from Airmont was designed to intimidate Rabbi Berger into agreeing to an inspection, to chill Rabbi Berger and Congregation of Ridnik's Constitutional right to free exercise of religion and assembly, and to prevent the addition of residential places of worship in Airmont like Congregation of Ridnik by prohibitively driving up costs, burdening the approval process with

delays, and ultimately preventing Rabbi Berger from obtaining approval for his residential place of worship.

144.    To recap, Rabbi Berger bought a house and installed a mikvah in the garage. Airmont then required him to build an additional three-car garage at his own expense. Rabbi Berger allowed members of his congregation pray at his home. Rabbi Berger then expended significant funds trying to get approval from Airmont to use certain areas of the home as a residential place of worship. After numerous expensive meetings, Airmont found reason after reason not to approve his request. It then cited him for criminal conduct and threatened jail time for not being finished with a process the Village purposefully delayed. This is all because Rabbi Berger wanted to let members of his congregation worship in his home.

145.    To date, Rabbi Berger has expended roughly $20,000 in fees and costs related to Airmont's sham application process.

iii.    *Congregation Khal Boston and Rabbi Abraham Horowitz*

146.    Plaintiff Rabbi Abraham Horowitz first welcomed his neighbors into a designated portion of his home on Murray Drive to meet and pray in 2007. Rabbi Horowitz called his residential place of worship and his neighbors who prayed there Congregation Khal Boston. Congregation Khal Boston met in an additional room in Rabbi Horowitz's home, and Rabbi Horowitz obtained a certificate of occupancy for this additional room. However, in June 2008, Airmont sent a letter that notified the Horowitzes that it "has come to the attention of the Building Department that you have opened a Residential House of Worship in your House." The letter further stated that "[i]n order to legalize your house of worship you should contact the Building Department . . . for us to explain the steps necessary to legalize your place of worship."

147.    In the next several years, including in 2009 and 2011, Congregation Khal Boston received several appearance tickets for being in violation of the 2007 Code. Upon realizing that

they needed extensive additional Village approvals for Congregation Khal Boston to be allowed to pray in a "legalized" way in his home, Rabbi Horowitz and Congregation Khal Boston embarked upon the long and expensive application process, which ultimately ended in failure as designed by Airmont.  And as with Rabbis Ribiat and Berger, Rabbi Horowitz expended a significant amount of time and money getting a formal application and plans submitted that went nowhere.

148.    Upon information and belief, Rabbi Horowitz began meeting with the CDRC in the summer of 2012 to discuss how to get his home in compliance with the 2007 Code.  Rabbi Horowitz met with the CDRC multiple times between 2012 and 2013 to present and revise architectural plans for Congregation Khal Boston. Each time he met with the CDRC, he was informed that something new needed to be fixed or changed in the plans before he could get the CDRC's approval.  Consistent with the experiences of Rabbi Ribiat and Rabbi Berger, topics or problems that appeared to be resolved at previous CDRC meetings would be brought up again as issues at subsequent meetings.   For example, most of Rabbi Horowitz's CDRC meetings included a focus on the parking spaces and driveways needed for his home, and from meeting to meeting the CDRC would go back and forth regarding how the proposed parking and driveways would be calculated.  All of the CDRC officials' actions related to Rabbi Horowitz's plans were designed to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and prevent judicial review of the Board's actions by keeping the application in perpetual limbo. Each CDRC member prohibitively drove up Rabbi Horowitz's costs and burdened the approval process with crushing delays.  Collectively, the CDRC and Planning Board officials approved and then reneged on that approval for Rabbi Horowitz's residential place of worship.   Airmont's unwritten policy of

religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC and Planning Board member's actions.

149. At some point between 2012 and 2014, Rabbi Horowitz was further informed by Airmont that he needed to install a fire safety system in order to pass inspection. After one or more inspections, Rabbi Horowitz was ordered by Building Inspector Smith and fire inspector Kim Weppler ("Fire Inspector Weppler") to install a fire alarm system, a fire station, a panic bar, strobe lights, emergency exits, and other additions to the residential place of worship. Rabbi Horowitz and Congregation Khal Boston complied with all of Airmont's demands at great expense and, ultimately, passed Building Inspector Smith's and Fire Inspector Weppler's inspections for a residential place of worship.

150. On March 11, 2014, Rabbi Horowitz and Congregation Khal Boston finally received approval from the CDRC to submit their proposal for a residential house of worship to the Planning Board.

151. Rabbi Horowitz met with the Planning Board in February 2015 to present the plans for an 850 square foot residential place of worship. At the conclusion of this meeting, however, Rabbi Horowitz and Congregation Khal Boston "received a negative declaration for revised plans as per the Village Consultants." The Village officials behaved according to their usual pattern and practice of discrimination further documented throughout this Complaint.

152. In August 2016, Rabbi Horowitz met with the Planning Board for a second time. After taking issue with several minor problems with the proposed plan, the Planning Board officials unanimously approved the application, entitling Rabbi Horowitz and Congregation Khal Boston to a certificate of occupancy. Once Rabbi Horowitz and Congregation Khal Boston received a certificate of occupancy, prayer in Rabbi Horowitz's home would be considered

49

legalized by the Village - meaning he and his congregants would no longer be practicing their religion under threat of criminal prosecution.

153.    In the summer and fall of 2016, however, there was a turnover among members of the CDRC, Planning Board, and/or other Village officials, including the replacement of Fire Inspector Weppler with Defendant Fire Inspector Pomeranz, and Building Inspector Smith with Defendant Building Inspector Louis Zummo.

154.    Several days after the August 2016 planning meeting, Rabbi Horowitz called the Village Planning and Zoning Board to inquire as to the status of the certificate of occupancy. Suzanne Carley, the Village Planning and Zoning Board Clerk, informed Rabbi Horowitz that they were only awaiting "a final sign-off."  After not receiving the certificate of occupancy for several weeks, Rabbi Horowitz again called Carley to inquire into its status.  Carley, however, now stated that the new inspectors, Fire Inspector Pomeranz and Building Inspector Zummo, did not want to sign off on the certificate of occupancy and, instead, would require Rabbi Horowitz to attend a new CDRC meeting.  Rabbi Horowitz subsequently called Fire Inspector Pomeranz to inquire about the certificate of occupancy and inform him that the site plan had already been approved by the Planning Board.  Fire Inspector Pomeranz responded by yelling at Rabbi Horowitz and stating that it did not matter that the plan had already been approved; Rabbi Horowitz would need to appear before the CDRC again because he said so.

155.    As was the case with the applications of Rabbis Ribiat and Berger, the Airmont Planning and Zoning officials' actions were intended to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and prevent judicial review of the Board's actions by keeping the application in perpetual limbo.  By refusing to grant the approved certificate of occupancy that Rabbi Horowitz

and Congregation Khal Boston was entitled to, Fire Inspector Pomeranz was acting pursuant to established custom and practice of Airmont to discriminate against Hasidic Residents.

156.   With no other choice, Rabbi Horowitz returned to the CDRC on October 11, 2016.  At this meeting the CDRC raised new issues with the application that had already been approved by the CDRC and the Planning Board.  Now the CDRC suddenly took issue with the size of the driveway, the weight the parking lot could sustain, whether neighbors could see the parking lot, and lack of "fire mounts," among other things.  In addition, the CDRC officials now claimed that Rabbi Horowitz's residential place of worship lacked an indoor bathroom.  This claim was false, of course, and upon information and belief, the CDRC officials knew this allegation was false when they made it.  The CDRC officials required Rabbi Horowitz to submit new architectural plans marking the location of the bathroom, even though the location of such facilities were already evident on the floor plan.  The CDRC officials further required that Fire Inspector Pomeranz conduct an inspection to ensure "the door is fire raided," despite the fact that the fire alarm system had already been approved by former Fire Inspector Weppler.  All of these requirements were to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and prevent judicial review of the boards' actions by keeping the application in perpetual limbo.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual CDRC and Planning Board member's actions.

157.   Rabbi Horowitz returned to the CDRC for another meeting on December 13, 2016.  As before, the CDRC found new issues with his architectural plans.  It further objected for the first time to the fact that the residential place of worship only had a single bathroom and claimed that there "has been an issue with mobile bathrooms being brought in for use."  The

CDRC officials alleged that Rabbi Horowitz received a violation for an outdoor bathroom during the High Holidays, a Jewish holiday period in the autumn.  Rabbi Horowitz explained that there was no such issue and that he never received any such notice of violation.  Rabbi Horowitz had rented a small portable bathroom for two or three days during the High Holidays that year because approximately 15 additional worshipers were expected at that time, and Congregation Khal Boston thought another bathroom would be more convenient.  But this explanation was irrelevant to the CDRC officials, who had already made up their minds: Rabbi Horowitz would need to revise his plans and build an additional bathroom even though it was unnecessary for 99% of the year.

158.    In addition, the Deputy Village Attorney, Dan Kraushaar, noted during the meeting that "although the plan was approved by the Planning Board, there are[] changes that may require further [Planning Board] approval," claiming there were no less than 11 new issues Rabbi Horowitz needed to address.  The CDRC officials then demanded a scheduled inspection with the Fire and Building Inspectors.

159.    Still not having received the certified of occupancy that he and Congregation Khal Boston were entitled to after previously passing all necessary inspections and Planning Board approvals, and seeing no other choice, Rabbi Horowitz reluctantly complied.  These unnecessary CDRC meeting and the compelled new inspections were designed to enforce Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and preventing judicial review of the Board's actions by keeping the application in perpetual limbo.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual Planning Board and CDRC member's actions.

160.    In early 2017, Fire Inspector Pomeranz and Building Inspector Zummo arrived at Congregation Khal Boston's residential place of worship for the CDRC-ordered inspection. However, instead of merely conducting a fire and safety inspection, the Village inspectors' visit quickly evolved into a full-blown site inspection including not just the area designated as the residential place of worship, but Rabbi Horowitz's entire home.   Rabbi Horowitz told the inspectors that he objected to them entering the living area of his home, but they ignored these objections and entered the living areas.  Fire Inspector Pomeranz and Building Inspector Zummo acted pursuant to established custom and practice of Airmont and its Building Department to frustrate, intimidate, delay, harass, and prevent Hasidic Residents from freely exercising their religion.

161.    At the conclusion of the inspection, Fire Inspector Pomeranz verbally indicated that Rabbi Horowitz had failed the inspection, but provided him no written or other formal notice or any details as to why.  After weeks of silence from the Village, Rabbi Horowitz contacted the Village multiple times to request a formal list of issues from the purported failed inspection so that he could address them.

162.    Several weeks after the inspection, in April 2017, Rabbi Horowitz finally heard back from the Village.  However, instead of receiving the requested reasons for his alleged failed inspection, Congregation Khal Boston received multiple notices to appear before the Airmont Justice Court for a trial and/or appearance regarding "REQ. CERT OF OCCUP.," "Planning bd approval," and "Fail Fire Inspection" by former Fire Inspector Ken Weppler, despite the fact that he had still not received any information about the results of the inspection or how he might address the supposed issues that led to the failed inspection.

53

163.    On or about May 4, 2017, Rabbi Horowitz appeared at the Village Justice Court for his scheduled trial and/or appearance.  When Rabbi Horowitz first entered the Village Justice Court after 5 PM, he saw Fire Inspector Pomeranz typing feverishly at a computer in clear view. Upon information and belief, the Village Justice Court is not Fire Inspector Pomeranz's office, and the reason he was present was to type out a fire inspection report of his site visit to Rabbi Horowitz's home in time for the scheduled trial and/or appearance, as a pretext to fine Rabbi Horowitz and Congregation Khal Boston.

164.    During this court appearance, Village Attorney Sean Mack and Acting Village Justice Karen Riley informed Rabbi Horowitz that he was being assessed a $2,000 fine for failing a fire inspection and a $1,000 fine for operating a house of worship without a certificate of occupancy.  Rabbi Horowitz objected to the Village-imposed fine for not having a certificate of occupancy where the Village itself was responsible for not issuing the certificate of occupancy to which he was entitled.  The Village rejected this reasoning.  Rabbi Horowitz further objected to the fine for the failed fire inspection, which he had previously passed following former Fire Inspector Weppler's inspection, and never received official notice of a failed fire inspection from Fire Inspector Pomeranz.   However, during Rabbi Horowitz's conversation with Village Attorney Mack and Acting Village Justice Riley, Fire Inspector Pomeranz entered the room, handed Rabbi Horowitz the long-requested inspection results, and said that the previous inspections by former Building Inspector Ian Smith and Fire Inspector Ken Weppler were insufficient and the fine should be imposed.  The Village accepted Fire Inspector Pomeranz's assessment and demanded Rabbi Horowitz pay the fine.

165.    Seeing no other options, Rabbi Horowitz has agreed to pay $3,000 in fines to have the violations dismissed.  Fire Inspector Pomeranz, Village Attorney Mack, and Acting Village

Justice Riley acted pursuant to Airmont's unwritten policy of discrimination against its Hasidic Residents by preventing the addition of residential places of worship and prevent judicial review of the Board's actions by keeping the application in perpetual limbo.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each individual Village official's actions.  These Village official's actions were also in accordance with the established custom and practice of Airmont to frustrate, intimidate, delay, harass, and prevent Hasidic Residents from freely exercising their religion.

166.    Shortly thereafter, Fire Inspector Pomeranz returned to Rabbi Horowitz's home to review the inspection results.  When Rabbi Horowitz asked Fire Inspector Pomeranz why it took almost two months for him to provide the results of his inspection, Fire Inspector Pomeranz admitted that during the inspection he found an electrical panel that was allegedly too close to a slop sink, a condition that Fire Inspector Pomeranz allegedly believed was such an imminent safety hazard that he believed there was a legal basis for seeking a formal 24-hour eviction of Rabbi Horowitz, his family, and Congregation Khal Boston.  Yet, despite weeks of searching for legal grounds to evict Rabbi Horowitz, his family and Congregation Khal Boston, Fire Inspector Pomeranz was apparently unable to do so and finally submitted his report.  Upon learning of the alleged safety risk that Fire Inspector Pomeranz had supposedly discovered weeks earlier, Rabbi Horowitz had the sink removed immediately.

167.    To be clear, Fire Inspector Pomeranz allegedly knew that there was a potential threat to the health and safety of Rabbi Horowitz and his family requiring a possible eviction on 24-hour notice, but was more concerned with finding a way to evict the Horowitzes and Congregation Khal Boston than warning them about the threats to their actual safety.  Fire Inspector Pomeranz acted with the full knowledge of the Village's previous approval of the

certificate of occupancy, but instead acted pursuant to established custom and practice of Airmont to frustrate, intimidate, delay, harass, and prevent Hasidic Residents from freely exercising their religion.  Airmont's unwritten policy of religious discrimination against the Hasidic Residents was the moving force behind each Fire Inspector Pomeranz's actions.

168.   In addition, Fire Inspector Pomeranz further demanded that Rabbi Horowitz construct an additional fire exit door in the residential place of worship even though there was already an exit door on that same side.  Rabbi Horowitz informed Fire Inspector Pomeranz that the existing doors were considered adequate under previous inspections by the Village and that, to Rabbi Horowitz's knowledge, an extra fire door was not required under existing code or regulations.  In response, Fire Inspector Pomeranz informed Rabbi Horowitz that if he wanted to pass the fire inspection, he would have to do whatever Fire Inspector Pomeranz demanded. Rabbi Horowitz installed the new fire door as demanded.

169.   But after incurring roughly $20,000 in fees and costs associated with this application process, Rabbi Horowitz and congregation Khal Boston still do not have their certificate of occupancy.  Recognizing that the Village puts up moving targets and requirements for Hasidic Residents that are all but impossible to satisfy, Rabbi Horowitz and Congregation Khal Boston have not appeared for additional CDRC or other Village meetings.  Indeed, it has been over 10 years since the Village first sent its notice warning Congregation Khal Boston to "legalize" prayer in Rabbi Horowitz's home, and the Village has determined for over 10 years to make that impossible.

**E.    Defendants Have Unlawfully Discriminated Against Plaintiffs In Additional Ways**

170.   Defendants do not constrain their discrimination against its Hasidic Residents merely through the use of zoning codes and sham application processes to block residential houses of worship.  Instead, in a continuing trend of discrimination that began at the very

56

inception of the Village, Defendants have targeted virtually any public display of Hasidic Jewish belief in attempt to maintain the so-called "character" of Airmont and discourage other members of the Hasidic Community from moving in.  Defendants' treatment of Plaintiff Chaim Cahan is the perfect example.

171.    In preparation for the Jewish holiday of Sukkot, Plaintiff Cahan set up a small, eight-foot by eight-foot sukkah in the front of his house located on Rustic Drive in Airmont a private residence.  A sukkah is a temporary tent-like shelter setup during Sukkot that memorializes the Jews' account of traveling through the desert for forty years after escaping bondage in Egypt.  The sukkah is only intended to be set up for eight (8) days, and is disassembled and removed immediately at the end of the holiday.  A sukkah is a common religious structure in the Hasidic Community during the High Holidays, a period of holidays that includes the major Jewish holidays of Rosh Hashanah and Yom Kippur, which precede Sukkot on the calendar.  Mr. Cahan's sukkah was clearly visible from the street.

172.    On Thursday, September 28, 2017, a person identifying himself as an "inspector" from the Village appeared at Mr. Cahan's front door.  When Mr. Cahan's wife opened the door, the "inspector" informed her that he had been sent personally by Airmont's mayor, Defendant Philip Gigante, a nearby neighbor of the Cahans, to inform them that the sukkah "might be a hazard" and to demand them to dismantle it immediately.  Mrs. Cahan informed the "inspector" that the sukkah was needed for religious observance and that it would be dismantled in less than two weeks.  The "inspector" said that he would deliver Mrs. Cahan's message.  Upon information and belief, the "inspector" had full access to the Cahan's front door, where this conversation took place.  Upon further information and belief, the "inspector" acting on behalf of the Village and Mayor Gigante did not demand the dismantling of the sukkah due to health and

safety concerns; rather, the demand was motivated by discriminatory intent to bar the overt religious practices of Airmont's Hasidic Residents that may affect the so-called "character" of the Village and deter other members of the Hasidic Community from moving in.

173.   The following day was the eve of Yom Kippur, the holiest day of the year for Hasidic Jews.  It is customary for members of the Hasidic Community to spend the eve of Yom Kippur preparing themselves mentally, physically and spiritually for Yom Kippur, which is a somber day of prayer and reflection that includes a 25-hour period of fasting that was scheduled to begin before sundown that day.  Much like other Jewish holidays, the use of electronic devices on Yom Kippur, including cell phones and emails, is strictly forbidden.

174.   That morning, Fire Inspector Pomeranz came to Mr. Cahan's house and demanded that Mr. Cahan immediately dismantle the sukkah, claiming that the sukkah was a fire hazard.  His purported reasons as to why Mr. Cahan's specific sukkah was a fire hazard kept shifting as Mr. Cahan defended the sukkah.  First, the sukkah had to be taken down because it was made of wood, which sukkahs are commonly made of.  Then it was because the sukkah was not "strong enough."  Then the reason was because it was too close to the house.  Then it was because it allegedly obstructed the Cahan's escape routes from the house in case of a fire in the house.  Then Fire Inspector Pomeranz claimed the sukkah could potentially obstruct entry to the house in case fire fighters needed to get into the house.  Finally, the claimed reason was because the sukkah posed a risk to firefighters with their heavy equipment if they had to pass the sukkah to get to a fire in the house.

175.   When asked where Mr. Cahan should rebuild his sukkah, Fire Inspector Pomeranz offered one alternative: Move it to the back of the house instead of the front. Once in the back of the house, Fire Inspector Pomeranz was no longer concerned about what the sukkah was made

of, its structural integrity, its proximity to the house, or the entry or exit points for the Cahans or firefighters. From the back of the house, no one would be able to see it from the street, and it would not be able to affect the "character" of the neighborhood. Upon information and belief, Fire Inspector Pomeranz had full access to the Cahan's front door, where the above-described conversation occurred. Upon further information and belief, the Fire Inspector Pomeranz acting on behalf of the Village and Mayor Gigante, did not demand the dismantling of the sukkah due to health and safety concerns; rather the demand was motivated by discriminatory intent to bar the overt religious practices of Airmont's Hasidic Residents that may affect the so-called "character" of the Village and deter other members of the Hasidic Community from moving in.

176. Mr. Cahan eventually agreed that after Yom Kippur was over, he would deconstruct, move, and rebuild the sukkah as the Village ordered, a task that would take Mr. Cahan several hours. However, this concession was still not good enough for Fire Inspector Pomeranz or the Village, who demanded that the sukkah be removed by the end of that day – again, on the eve of Yom Kippur. Mr. Cahan informed Fire Inspector Pomeranz that he was planning to leave Airmont within hours so he could spend Yom Kippur with his family congregation in New Jersey, and would not have time to do so before he left. In response, Pomeranz threatened to return with marshals that night – the night of Yom Kippur – to evict Mrs. Cahan and their young children, who planned to remain in their Airmont home during Yom Kippur.

177. Faced with the Village's threat against his family when he would have been away from them without any means to contact them, as doing so would be forbidden during Yom Kippur, Mr. Cahan succumbed to Fire Inspector Pomeranz's demands and spent the majority of the day deconstructing and moving the sukkah. Because of the time it took him to follow the

Village's orders, Mr. Cahan was unable to leave in time to attend his family congregation for Yom Kippur and was forced to scramble to find alternative arrangements for the holiest day of the year.

178.     Fire Inspector Pomeranz's ever-shifting reasons why the sukkah constituted a fire hazard, as well as his agreeing to the solution of simply moving it to the back of the house, made clear that he and Airmont did not genuinely believe there was any fire hazard.  Instead, he and Airmont simply disliked the aesthetic of the sukkah, which was clearly visible from the road and a visual manifestation of Hasidic Jewish faith in a location that was too close to the mayor's house.

179.     At all times during his interaction with Mr. Cahan, Fire Inspector Pomeranz acted pursuant to established custom and practice of Airmont and its Building Department to frustrate, intimidate, delay, harass, and prevent Hasidic Jewish residents from exercising their religion.

180.     This entire event inflicted deep emotional distress on Mr. Cahan and his family.

181.     This is just one example of Airmont stopping at nothing to discriminate against Hasidic Jews in every way they can.

182.     Moreover, the religious discrimination that Defendants have demonstrated against the Plaintiffs is all the more obvious when comparing their treatment of Plaintiffs to similarly situated other religious groups.  For example, just down the block from Plaintiffs Rabbi Berger and Mr. Cahan is the Foster Church.

183.     Upon information and belief, the Foster Church operates out of an entire house, consisting of 1,799 square feet with a 1,400 square foot finished basement, in the same residential districts in Airmont as the Plaintiffs reside and hope to operate their residential places of worship.  The Foster Church is a fully tax-exempt organization.  The self-defined purpose and

activities of the Foster Church is "spreading the word of our Lord Jesus Christ, bible readings, [and] gospel preaching." The Foster Church is regularly attended by its congregation, and has no limitations or restrictions on its ability to drive for religious reasons. Despite operating as a place for religious meeting in the same residential district, the Foster Church has received no opposition from Airmont to operate fully and freely.

184. The 2007 Code and 2018 Code were duly enacted by Village of Airmont and its Board of Trustees and reflect the official policies of the Village of Airmont. The CDRC and Planning Boards are delegated authority under the 2007 Code and 2018 Code to deny permits for residential places of worship and residential places of assembly and are therefore final policymakers with respect to the issuance or denial of a permit or variance.

185. As evidenced herein, Inspector Pomeranz is the enforcement authority with respect to prosecuting building code violations and is a final policymaker for prosecuting building code violations for the Village of Airmont.

186. Statements from the Planning Board and CDRC indicate that pursuant to the 2018 Code, the Rabbi Plaintiffs' pending applications have been effectively denied and the Rabbi Plaintiffs will need to restart the permitting process from the beginning, meaning the Rabbi Plaintiffs have spent thousands of dollars for a zoning determination that they never received.

187. The facts stated above, including Defendants' history of discrimination against Hasidic Jews, their refusal to provide any guidance before architectural plans were proposed, Defendants' apparent refusal to grant a permit (absent court intervention) to any Hasidic congregation that would allow them to congregate in a residential dwelling, their repeated adding of new conditions for the issuance of a permit after previous conditions had been met, the refusal to rule on Plaintiff's permit requests after all conditions had been met, Defendants' refusal to

further consider applications submitted pursuant to the 2007 Code, the City's open-ended process wherein Plaintiffs are required to get permission from two boards at great expense and within no set time frame, and Defendants' indications that Plaintiffs must begin the approval process anew under the 2018 Code, all indicate that Defendants have dug in their heels and would deny any applications or variance requests made by Plaintiffs.

188.    Defendants' actions identified herein were designed to avoid judicial review by keeping Plaintiffs' applications in perpetual limbo, where Defendants would create pretextual and arbitrary reasons to avoid granting a permit with the indication that compliance with new and often inconsistent requirements would result in the issuance of a permit.  The process was designed to avoid issuing a final determination on Plaintiffs' applications until they either ran out of money to pursue their application or otherwise gave up.  This process was intentionally designed to evade judicial review because Defendants' knew from previous judicial interventions that the courts would likely invalidate Airmont's Zoning Codes and related permitting processes.

**FIRST CAUSE OF ACTION**
**Unlawful Substantial Burden**
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(a)**
**(Against all Defendants)**

189.    Plaintiffs reallege paragraphs 1-188 of the Complaint as if fully set forth herein.

190.    Defendants' actions, policies, customs, and practices, including those in enforcement of or otherwise related to 2007 and 2018 Codes violate the Substantial Burden Clause of RLUIPA, 42 U.S.C. § 2000cc(a)(1).  The zoning processes regarding residential places of worship and residential places of assembly involve individualized assessments by Airmont and its officials of the proposed use of property as part of a system of land use regulations.  These actions, policies, customs, and practices were not in furtherance of a compelling

government interest nor the least restrictive means of furthering a compelling government interest.

191.    The Hasidic Jewish religion requires that residential houses of worship meet certain requirements, such as having enough space to accommodate a quorum and being located within walking distance of attendees' homes.

192.    Defendants' actions, policies, customs, and practices in the handling of Plaintiffs' applications and property use as alleged herein, including without limitation enforcement of or otherwise related to the 2007 Code, violate the Substantial Burden Clause of RLUIPA, 42 U.S.C. § 2000cc(a)(1), by imposing substantial burdens on the religious exercise of Hasidic Jews.

193.    Section 210-12.1 of the 2007 Code violates RLUIPA's Substantial Burden Clause, on its face and as applied to Plaintiffs, by preventing residents from hosting neighbors for worship purposes without first undergoing a prohibitively cumbersome, lengthy and expensive approval process.  Approval was required from both the CDRC and the Planning Board, either of which could deny an application for virtually any reason at all.  Their unlimited discretion in this regard made obtaining approval for a place of worship impracticable if not outright impossible.  There was no limit to the number of meetings the approval process required.  The various recommendations and "fixes" to submitted plans often required spending thousands of dollars.  An applicant had to pay the fees associated with every CDRC or Planning Board meeting, including the hourly "consulting fees" of the members of the respective boards, which regularly totaled $1,000 or more per meeting.  Although these applications were supposed to be reviewed on a nominally expedited basis, 2007 Code includes no actual deadlines for consideration and the CDRC and Planning Board routinely drug the process out.  Failure to get

the required Village approval before using one's home as a place of worship was a crime punishable by fines of up to $1,000/day or a year in jail.

194.   Section 210-12.1 of the 2007 Code and Defendants' related actions, policies, customs, and practices, including those in enforcement thereof as alleged herein, do not serve any legitimate governmental interest, much less a compelling governmental interest as is required to satisfy RLUIPA.

195.   Defendants' actions, policies, customs, and practices, including those in enforcement of or otherwise related to Section 210.12.1 of the 2007 Code also violate the Substantial Burden Clause as applied to Plaintiffs.  Rabbi Plaintiffs submitted applications that were denied for constantly shifting reasons.  Rabbi Plaintiffs were shuffled back and forth between the CDRC and Planning Board.  The process involved jumping through hoops, only to have still more hoops appear.  No matter what changes were made to proposed plans in an attempt to cure the purported issues, plans were still rejected or subject to a pocket veto.  Rabbi Plaintiffs incurred tens of thousands of dollars in fees and expenses associated with the review process.  In some cases, their applications were pending for years.  This process was intended to evade judicial review by keeping Plaintiffs in a costly administrative limbo.

196.   The 2018 Code facially violates the Substantial Burden Clause of RLUIPA, 42 U.S.C. § 2000cc(a)(1), by imposing substantial burdens on the religious exercise of Hasidic Jews.   Specifically, sections 210-12.1 and 210-74 imposes the same lengthy, arbitrary, discretionary, and expensive procedural hurdles as the 2007 Code and threatens the same criminal penalties for alleged non-compliance. Indeed, the 2018 Code imposes new impediments for Plaintiffs.

197.    Sections 210-12.1 and 210-74 of the 2018 Code and Defendants' actions, policies, customs, and practices, including those in enforcement of or otherwise related to Sections 210-12.1 and 210-74 of the 2018 Code as alleged herein do not serve any legitimate governmental interest, much less a compelling governmental interest as is required by RLUIPA.

198.    In fact, the 2007 and 2018 Codes and Defendants' related actions, policies, customs, and practices as alleged herein were intended to prevent Hasidic Jews from worshiping in the manner required by their religion, if not to outright discourage them from moving to Airmont in the first place.

199.    The 2018 Code, and Defendant's actions pursuant to this code as alleged herein, also violates the Substantial Burden Clause as applied to the Rabbi Plaintiffs. The 2018 Code subjects the Rabbi Plaintiffs to the same discriminatory and arbitrary approval process as the 2007 Code.  Moreover, the 2018 Code contains no grandfathering clause for the Rabbi Plaintiffs' pending applications.  Statements from the Planning Board and CPRC indicate that pursuant to the 2018 Code, the Rabbi Plaintiffs' pending applications have been effectively denied, and the Rabbi Plaintiffs will need to restart the permitting process from the beginning, meaning the Rabbi Plaintiffs have spent thousands of dollars for a zoning determination that they never received.  Defendants' application of the 2018 Code against the Rabbi Plaintiffs places them in a position of beginning anew arbitrary, oppressively expensive, open-ended, and ultimately futile permitting process.

200.    Defendants have deprived, and continue to deprive Rabbi Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use restrictions in an arbitrary manner that places a substantial burden on the Rabbi Plaintiffs'

religious exercise without satisfying any compelling governmental interest, and without using the least restrictive means of furthering any alleged compelling interest.

201.    Rabbi Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional and statutory rights.

202.    Rabbi Plaintiffs have suffered and continue to suffer irreparable harm, damages, and injury as a result of the enforcement of these discriminatory laws.  Rabbi Plaintiffs are entitled to recover their damages and to obtain a declaration that Section 210-12.1 of the 2007 Code and Sections 210-12.1 and 210-74 of the 2018 Code violate RLUIPA's Substantial Burden Clause, both on their face and as applied.  Rabbi Plaintiffs will continue to suffer such damages unless the Defendants' acts and conduct complained of are permanently enjoined.

203.    Rabbi Plaintiffs are entitled to recover their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), in an amount to be proved at trial.

**SECOND CAUSE OF ACTION**
**Unlawful Unequal Treatment**
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(1)**
**(Against all Defendants)**

204.    Plaintiffs reallege paragraphs 1-203 of the Complaint as if fully set forth herein.

205.    Defendants' actions, policies, customs, and practices in the handling of Plaintiffs' applications and property use as alleged herein, including without limitation those in enforcement of or otherwise related to Section 210-12.1 of the 2007 Code, imposed burdensome requirements on Hasidic Residents that did not apply to other Airmont residents similarly situated.  These actions, policies, customs, and practices were not in furtherance of a compelling government interest nor the least restrictive means of furthering a compelling government interest.

206.    Section 210-12.1 of the 2007 Code applied to residential places of worship, including Hasidic Residents' congregations and assemblies, by requiring approval in order to use homes for religious gatherings and prayer. The code does not impose similar requirements on people assembling for non-religious purposes.

207.    By imposing additional requirements on Hasidic Residents, Defendants' actions, policies, customs, and practices, including those in enforcement of or otherwise related to Section 210-12.1 treated Hasidic Residents' assemblies on less than equal terms with nonreligious assemblies or institutions.  In doing so, the 2007 Code plainly violated the Equal Terms Clause of RLUIPA, 42 U.S.C. § 2000cc(b)(1).

208.    The Defendants' actions, policies, customs, and practices, including those in enforcement of or otherwise related to 2007 Code also violated RLUIPA as applied to Rabbi Plaintiffs in this case since Rabbi Plaintiffs' applications to use their homes as residential places of worship—which constituted a religious assembly under the Equal Terms Clause—were denied multiple times on the basis of Section 210-12.1 of the 2007 Code.

209.    In order to use their homes as residential places of worship, Rabbi Plaintiffs had to seek approval from Defendants.  In contrast, upon information and belief, residents seeking to assemble for any other purpose did not require approval from Defendants.

210.    Requiring Hasidic Residents' assemblies, but not other residential assemblies, to seek approval from Defendants violates the Equal Terms Clause.

211.    Defendants have deprived under the 2007 Code, and continue to deprive under the 2018 Code, Rabbi Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations that discriminate against the Rabbi Plaintiffs on the basis of religion.

212.    The 2018 Code and Defendants' actions pursuant to it also violate the Equal Terms Clause as applied to the Rabbi Plaintiffs. The 2018 Code subjects the Rabbi Plaintiffs to the same discriminatory and arbitrary approval process as the 2007 Code.  This Code is specifically aimed at Hasidic Jews who must meet regularly and cannot meet in different locations for their religious services, in part because of their religious prohibition against driving on the Sabbath.  Moreover, the 2018 Code contains no grandfathering clause for the Rabbi Plaintiffs' pending applications.  Statements from the Planning Board and CPRC indicate that pursuant to the 2018 Code, the Rabbi Plaintiffs' pending applications have been effectively denied, and the Rabbi Plaintiffs will need to restart the permitting process from the beginning, meaning the Rabbi Plaintiffs have spent thousands of dollars for a zoning determination that they never received.  Defendants' application of the 2018 Code against the Rabbi Plaintiffs places them in a position of beginning anew arbitrary, oppressively expensive, open-ended, and ultimately futile permitting process.

213.    Rabbi Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

214.    Rabbi Plaintiffs have suffered harm, damages, and injury as a result of the enforcement of these discriminatory laws, and are entitled to recover damages and to obtain a declaration that Section 210-12.1 violated RLUIPA's Equal Terms Clause, both on their faces and as applied.

215.    Rabbi Plaintiffs are entitled to recover their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), in an amount to be proved at trial.

### THIRD CAUSE OF ACTION
**Unlawful Discrimination**
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(2)**
**(Against all Defendants)**

216.    Plaintiffs reallege paragraphs 1-215 of the Complaint as if fully set forth herein.

217.    Defendants' actions, policies, customs, and practices in the handling of Plaintiffs' applications and property use as alleged herein, including without limitation those pursuant to 2007 Code Section 210-12.1, imposed burdensome requirements on Hasidic Residents that did not apply to similarly situated nonreligious assemblies.  These actions, policies, customs, and practices were not in furtherance of a compelling government interest nor the least restrictive means of furthering a compelling government interest.

218.    By imposing these requirements on places of worship—which constituted a religious assembly under the Nondiscrimination Clause—Section 210-12.1 discriminated against Hasidic Residents' assemblies on the basis of religion.  Accordingly, the 2007 Code on its face violated the Nondiscrimination Clause of RLUIPA, 42 U.S.C. § 2000cc(b)(2).

219.    The 2007 Code also violated RLUIPA as applied to Rabbi Plaintiffs in this case. Rabbi Plaintiffs' applications to use their homes as residential places of worship—which constituted a religious assembly under the Equal Terms Clause—have been denied multiple times on the basis of Section 210-12.1 of the 2007 Code.

220.    In order to use their homes as residential places of worship, Rabbi Plaintiffs had to seek approval from Defendants.  In contrast, residents seeking to assemble for any other reason did not require approval from Defendants.

221.    Accordingly, Section 210-12.1, as applied to Rabbi Plaintiffs, violated the Nondiscrimination Clause of RLUIPA.

222.    Defendants enacted the 2007 and 2018 Codes for the purpose of continuing their discriminatory policies against Hasidic Residents.

223.    There is no compelling governmental interest justifying zoning codes that discriminate on the basis of religion.

224.    From Airmont's inception, Defendants have made countless and continuous efforts to frustrate and prevent the development of residential properties owned by Hasidic Residents.

225.    Defendants have deprived, and continue to deprive, Rabbi Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations, including the building moratorium, that discriminate against the Rabbi Plaintiffs on the basis of religion.

226.    Properties owned by Hasidic Residents in Airmont face unwavering discrimination against them by Defendants.

227.    The 2018 Code also discriminates against Plaintiffs facially and as applied to the Rabbi Plaintiffs. The 2018 Code places restrictions on the use of residences that disproportionately impact Hasidic Jews.  Unlike social or civic meetings, Hasidic Jews do not have the option to regularly meet at different locations because they must meet in a place suitable for religious instruction and within a short walk of their residence.  Moreover, these meetings happen on a regular schedule, unlike social gatherings which tend to be impromptu and unscheduled.

228.    The 2018 Code also subjects the Rabbi Plaintiffs to the same discriminatory and arbitrary approval process as the 2007 Code.  Moreover, the 2018 Code contains no grandfathering clause for the Rabbi Plaintiffs' pending applications.  Statements from the

Planning Board and CPRC indicate that pursuant to the 2018 Code, the Rabbi Plaintiffs' pending applications have been effectively denied and the Rabbi Plaintiffs will need to restart the permitting process from the beginning, meaning the Rabbi Plaintiffs have spent thousands of dollars for a zoning determination that they never received.  Defendants' application of the 2018 Code against the Rabbi Plaintiffs places them in a position of beginning anew arbitrary, oppressively expensive, open-ended, and ultimately futile permitting process.

229.    Rabbi Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

230.    Rabbi Plaintiffs have suffered harm, damages, and injury as a result of the enforcement of these discriminatory laws.  Rabbi Plaintiffs are entitled to recover such damages and to obtain a declaration that Section 210-12.1 violated RLUIPA's Nondiscrimination Clause, both on its face and as applied.

231.    Rabbi Plaintiffs are entitled to recover their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), in an amount to be proved at trial.

### FOURTH CAUSE OF ACTION
**Unlawful Unreasonable Limitation**
**Religious Land Use and Institutionalized Persons Act of 2000**
**42 U.S.C. § 2000cc(b)(3)**
**(Against all Defendants)**

232.    Rabbi Plaintiffs reallege paragraphs 1-233 of the Complaint as if fully set forth herein.

233.    Defendants' actions, policies, customs, and practices, in the handling of Plaintiffs' applications and property use as alleged herein, including without limitation those pursuant to 2007 Code Section 210-12.1, imposed burdensome and unreasonable requirements on Hasidic Residents that made it unduly burdensome, if not impossible, to congregate in their homes for

religious purposes. These actions, policies, customs, and practices were not in furtherance of a compelling government interest nor the least restrictive means of furthering a compelling government interest.

234. Section 210-12.1 of the 2007 Code imposed burdensome and unattainable requirements on Hasidic Residents, frustrating, if not making it impossible for them to use their homes as places of worship. Section 210-12.1 thus unreasonably limited Hasidic Jewish assemblies, institutions, and structures.

235. Sections 210-12.1 and 201-74 of the 2018 Code likewise impose unnecessarily burdensome and unattainable requirements on Hasidic Residents, by unreasonably limiting the Hasidic Residents' assemblies, institutions and structures.

236. The 2018 Code also subjects the Rabbi Plaintiffs to the same discriminatory and arbitrary approval process as the 2007 Code. Moreover, the 2018 Code contains no grandfathering clause for the Rabbi Plaintiffs' pending applications. Statements from the Planning Board and CPRC indicate that pursuant to the 2018 Code, the Rabbi Plaintiffs' pending applications have been effectively denied and the Rabbi Plaintiffs will need to restart the permitting process from the beginning, meaning the Rabbi Plaintiffs have spent thousands of dollars for a zoning determination that they never received. Defendants' application of the 2018 Code against the Rabbi Plaintiffs places them in a position of beginning anew arbitrary, oppressively expensive, open-ended, and ultimately futile permitting process.

237. These substantial limitations are and were arbitrary, unreasonable, and unwarranted by any legitimate governmental interest. As such, Section 210-12.1 of the 2007 Code and Sections 210-12.1 and 210-74 of the 2018 Code and Defendants' actions, policies,

customs, and practices alleged herein violate the Unreasonable Limitations Clause of RLUIPA, 42 U.S.C. § 2000cc(b)(3).

238.    Rabbi Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

239.    Rabbi Plaintiffs have suffered and continue to suffer irreparable harm, damages, and injury as a result of the enforcement of these discriminatory laws.  Rabbi Plaintiffs are entitled to recover their damages and to obtain a declaration that Section 210-12.1 of the 2007 Code and Sections 210-12.1 and 210-74 of the 2018 Code violate RLUIPA's Substantial Burden Clause.  Rabbi Plaintiffs will continue to suffer such damages unless the Defendants' acts and conduct complained of are permanently enjoined.

240.    Rabbi Plaintiffs are entitled to recover their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), in an amount to be proved at trial.

### FIFTH CAUSE OF ACTION
**Violation of the First and Fourteenth Amendments of the United States Constitution
42 U.S.C. § 1983
(Against all Defendants)**

241.    Plaintiffs reallege paragraphs 1-240 of the Complaint as if fully set forth herein.

242.    Defendants have deprived and continue to deprive Plaintiffs of their right to the free exercise of religion by discriminating against and substantially burdening Plaintiffs without a compelling government interest, solely on the basis of Plaintiff's religion.

243.    Defendants' laws, policies, customs, practices, and actions are hostile towards Hasidic Residents and effectively impose a penalty on the free exercise of religion by targeting, regulating or outlawing conduct because it is religiously oriented.

244.     Plaintiffs have a sincerely held religious belief that compels them to meet together regularly according to Jewish law.  Defendants' laws and actions caused and continue to cause a substantial burden to Plaintiffs' sincerely held religious beliefs.

245.     Defendants' laws and actions have deprived and continue to deprive Plaintiffs of their right to free exercise of religion by treating religious assemblies and institutions on unequal terms compared to nonreligious assemblies and institutions.

246.     Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

247.     Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury.  Plaintiffs will continue to suffer such damages unless the Defendants' actions complained of are permanently enjoined. Plaintiffs are entitled to recover compensatory and nominal damages, as well as attorneys' fees.

## SIXTH CAUSE OF ACTION
### Violation of the First and Fourteenth Amendments of the U.S. Constitution
### 42 U.S.C. § 1983
### (Against all Defendants)

248.     Plaintiffs reallege paragraphs 1-247 of the Complaint as if fully set forth herein.

249.     Defendants' actions, policies, customs, and practices alleged herein have deprived and continue to deprive the Plaintiffs of their right to freedom of intimate association and freedom of expressive association, as secured by the First Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, by intruding upon the Plaintiffs' right to religious association and assemble for purposes of protected expressive activity.

250.     In doing so, Defendants have taken every action they can think of, including the enactment of laws, to prevent Plaintiffs from practicing their religion.

251.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

252.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury.  Plaintiffs will continue to suffer such damages unless the Defendants' actions complained of are permanently enjoined.  Plaintiffs are entitled to recover compensatory and nominal damages, as well as attorneys' fees.

<u>**SEVENTH CAUSE OF ACTION**</u>
**Violation of the Fifth and Fourteenth Amendments of the U.S. Constitution**
**42 U.S.C. § 1983**
**(Against all Defendants)**

253.    Plaintiffs reallege paragraphs 1-251 of the Complaint as if fully set forth herein.

254.    Defendants' actions, policies, customs, and practices alleged herein have deprived and continue to deprive the Plaintiffs of their rights to substantive and procedural due process, as secured by the Fifth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, by denying or refusing to approve Plaintiffs' applications for permission to use their homes for religious gatherings.

255.    In doing so, Defendants have taken every action they can think of, including the enactment of laws, to prevent Plaintiffs from practicing their religion.

256.    Defendants' undue and arbitrary delay in processing Plaintiffs' applications was intended to deny Plaintiffs any form of judicial review, and instead lock them into an expensive administrative process until they either ran out of funds to further pursue administrative relief or dismissed their efforts as futile.  This delay further violated the Village's own rules requiring expedited consideration of such applications.

257.   This process also was subject to the total and unfettered discretions of Defendants.  Plaintiffs' applications would have been granted but for Defendants' arbitrary, abusive, capricious, and biased treatment of Plaintiffs' applications.

258.   Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their Constitutional rights.

259.   Defendants have caused the Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury.  Plaintiffs will continue to suffer such damages unless the Defendants' actions complained of are permanently enjoined.  Plaintiffs are entitled to recover compensatory, nominal and punitive damages, as well as attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**Violation of the Fourteenth Amendment of the U.S. Constitution**
**42 U.S.C. § 1983**
**(Against all Defendants)**

260.   Plaintiffs reallege paragraphs 1-259 of the Complaint as if fully set forth herein.

261.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

262.   Defendants' laws, customs, practices, policies, and actions have deprived and continue to deprive Plaintiffs of their right to equal protection of the laws.

263.   Residential houses of worship are necessary to allow Plaintiffs and all other Hasidic Residents to exercise their religion in Airmont.

264.   Both the 2007 and 2018 Codes, and the actions of Defendants in enacting and enforcing them, have infringed upon the rights secured by the Fourteenth Amendment by (1) discriminating against and targeting Plaintiffs; (2) treating Hasidic Residents on less than

equal terms to others; and (3) enforcing land use regulations without legitimate governmental purpose, which constitute an interference with fundamental rights.

265.    Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

266.    Defendants have caused Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury.  Plaintiffs will continue to suffer such damages unless Defendants' conduct complained of is permanently enjoined.  Plaintiffs are entitled to recover compensatory and nominal damages, as well as attorneys' fees.

**NINTH CAUSE OF ACTION**
**Violation of the Fourteenth Amendment of the U.S. Constitution**
**42 U.S.C. § 1985(3)**
**(Against all Defendants)**

267.    Plaintiffs reallege paragraphs 1-266 of the Complaint as if fully set forth herein.

268.    By their conduct as set forth in this Complaint, and acting under color of state law, Defendants have conspired to deprive Plaintiffs and others on the basis of their religious beliefs and practices of the equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution.

269.    Defendants have caused Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury.  Plaintiffs will continue to suffer such damages unless the conduct complained of herein is permanently enjoined.  Plaintiffs are entitled to recover compensatory and nominal damages, as well as attorneys' fees.

**TENTH CAUSE OF ACTION**
**Violation of the Fair Housing Act**
**42 U.S.C. § 3601 et seq.**
**(Against all Defendants)**

270.    Plaintiffs reallege paragraphs 1-269 of the Complaint as if fully set forth herein.

271.    The 2007 and 2018 Codes and Defendants' actions, policies, practices, and customs make it nearly impossible for Hasidic Residents to construct a dwelling in accordance with their religious requirements, making housing for Hasidic Residents "unavailable" in violation of the Fair Housing Act.

272.    Plaintiffs' religious practices were a significant factor—if not the only factor—behind Defendants' enactment of the 2007 and 2018 Codes and the facts alleged herein.

273.    Plaintiffs are aggrieved persons within the meaning of the Fair Housing Act and have suffered damages as a result of Defendants' conduct.  Defendants' conduct constitutes a denial of rights granted by Title VIII of the Civil Rights Act of 1968 to a group of persons, raising an issue of general public importance.

274.    Defendants have caused Plaintiffs to suffer, and to continue to suffer, irreparable harm, damage, and injury.  Plaintiffs will continue to suffer such damages unless the Defendants' acts and conduct complained of are permanently enjoined.  Plaintiffs are entitled to recover actual and punitive damages, as well as attorneys' fees.  42 U.S.C. § 3613(c)(1)-(2).

## ELEVENTH CAUSE OF ACTION
### Violation of the New York State Constitution Article I §§ 3, 6, 11
### (Against all Defendants)

275.    Plaintiffs reallege paragraphs 1-274 of the Complaint as if fully set forth herein.

276.    Defendants have acted under color of law and have conspired against Plaintiffs' rights in violation of Article I, § 3 (freedom of association), Article I, § 6 (due process), Article I, § 9, and Article I, § 11 (equal protection; discrimination in civil rights) of the New York State Constitution.

277.    The 2007 and 2018 Codes and the actions, policies, customs, and practices alleged herein placed and continue to place a substantial burden on Plaintiffs' religious exercise in violation of Article I § 3 of the New York State Constitution.

278.    There is no compelling governmental interest supporting the discriminatory provisions of the 2007 and 2018 Codes.

279.    Article I, § 6 of the New York State Constitution similarly provides, in pertinent part, that "[n]o person shall be deprived of life, liberty or property without due process of law."

280.    Plaintiffs have been continuously discriminated against through the enactment of zoning laws and Defendants' enforcement thereof.

281.    Article I, § 11 of the New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

282.    Defendants' actions have sought to restrict Hasidic Residents from entering the community and from practicing their faith once there.  The 2007 and 2018 Codes, as well as actions by Defendants in furtherance thereof, clearly discriminate against Hasidic Residents in a manner not experienced by other residents.

283.    As a result of Defendants' actions, Plaintiffs have suffered, and continue to suffer irreparable harm, damage, and injury, and Plaintiffs will continue to suffer such harm unless the Defendants' actions and conduct complained of are permanently enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Congregation Kollel Meor Yosef, Congregation of Ridnik, Congregation Khal Boston, Rabbi David Ribiat, Rabbi Moishe Berger, Rabbi Abraham Horowitz and Chaim Cahan pray that this Court enter judgment:

1)    Declaring that the Defendants' actions, policies and practices, as alleged herein, violate RLUIPA and the Fair Housing Act, facially and as applied to Plaintiffs;

79

2)      Declaring that Defendants' actions, policies, and practices, as alleged herein, infringe on Plaintiffs' rights guaranteed under the United States Constitution and the New York State Constitution, facially and as applied to Plaintiffs;

3)      Declaring that, on its face and as applied to Plaintiffs, the 2007 Code § 210-12.1 violated the First and Fourteenth Amendments of the U.S. Constitution and Article I, §§ 3, 6, and 11 of the New York State Constitutions;

4)      Enjoining the Defendants from:

   a.   enforcing the provisions of the 2018 Code §§ 210-12.1 and 210-74 generally and against Plaintiffs;

   b.   Imposing a substantial burden on the religious exercise of Plaintiffs that is not narrowly tailored to further a compelling governmental interest;

   c.   Treating Plaintiffs on less than equal terms with nonreligious assemblies or institutions;

   d.   Discriminating against Plaintiffs on the basis of religion or religious denomination;

   e.   Making housing unavailable to Plaintiffs on the basis of their religion; and

   f.   Further infringing on Plaintiffs' Constitutional rights in the same or similar manner as alleged herein; and

   g.   Seeking unpaid fees incurred under the 2007 Code, or punishing Plaintiffs financially or otherwise for failure to pay such fees;

5)      Requiring Defendants, including any officers, employees, agents, successors, of any municipal, administrative, or corporate Defendants, and all other persons in concert or participation with Defendants, to:

    a.   Take such actions as may be necessary to restore Plaintiffs to the position they would have been in but for the Defendants' unlawful conduct, including but not limited to granting such approvals as are necessary to allow Plaintiffs to peacefully assemble in accordance with their religion and use the properties at issue as places of worship; and

    b.   Take such actions as may be necessary to prevent the recurrence of such unlawful conduct in the future, including but not limited to, providing RLUIPA training to Village personnel, establishing procedures to address complaints of RLUIPA violations, and maintaining records and submitting reports relating to RLUIPA compliance;

6)    Awarding Plaintiffs their actual and compensatory damages to be determined at trial, except Plaintiffs do not seek damages against Defendants in their individual capacities;

7)    Awarding Plaintiffs their reasonable attorneys' fees and court costs;

8)    Awarding pre-judgment and post-judgment interest;

9)    Awarding punitive damages; and

10)    Awarding all other appropriate relief as the Court deems just and proper, both in equity and at law.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a jury on all issues so triable.

Dated:   New York, New York
         December 10, 2018

NORTON ROSE FULBRIGHT US LLP

By:            */s/ Benjamin D. Bleiberg*
         Stephen C. Dillard*
         D'Lesli M. Davis*
         Benjamin D. Bleiberg
         Jordan Campbell*
         1301 Avenue of the Americas
         New York, New York 10019-6022
         Tel: (212) 408-5100
         steve.dillard@nortonrosefulbright.com
         dlesli.davis@nortonrosefulbright.com
         benjamin.bleiberg@nortonrosefulbright.com
         jordan.campbell@nortonrosefulbright.com

         Hiram S. Sasser III, Esq.*
         Keisha Russell, Esq.*
         Lea Patterson, Esq.*
         FIRST LIBERTY INSTITUTE
         2001 W Plano Pkwy
         Suite 1600
         Plano, Texas 75075

         *Attorneys for Plaintiffs*
         *\* to be admitted pro hac vice*