UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONGREGATION OF RIDNIK, RABBI MOISHE BERGER, CONGREGATION KOLLEL MEOR YOSEF, RABBI DAVID RIBIAT, CONGREGATION KHAL BOSTON, RABBI ABRAHAM HOROWITZ, and CHAIM CAHAN<br><br>       Plaintiffs,<br><br>  -against-<br><br>VILLAGE OF AIRMONT, PHILIP GIGANTE, VILLAGE OF AIRMONT BOARD OF TRUSTEES, VILLAGE OF AIRMONT ZONING BOARD OF APPEALS, LAURIE DIFRANCESCO, BUILDING DEPARTMENT OF THE VILLAGE OF AIRMONT, LOUIS ZUMMO, PLANNING BOARD OF THE VILLAGE OF ARIMONT, COMMUNITY DESIGN REVIEW COMMITTEE, DAN KRAUSHAAR, EVE MANCUSO, STU TURNER, and SHLOMO POMERANZ,<br><br>       Defendants. | 18 Civ. 11533 (NSR)(AEK) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**SOKOLOFF STERN LLP**
*Attorneys for Defendants*
179 Westbury Avenue
Carle Place, New York 11514
(516) 334-4500
File No. 180175

*Of Counsel:*
 Brian S. Sokoloff
 Leo Dorfman
 Alexander J. Eleftherakis

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 2

I:  ALL CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS FAIL ............................... 17

    A.   No Individual Liability Under RLUIPA ...................................................... 17

    B.   No Basis for Individual Liability Under § 1983 ........................................ 17

    C.   The Village Boards Are Not Suable Entities ............................................. 20

II:  ALL AS-APPLIED CLAIMS ARE UNRIPE ......................................................... 20

III:  NO STANDING FOR RELIGIOUS FREEDOM OR DUE PROCESS
    CLAIMS RELATING TO THE MORATORIUM OR 2018 CODE ................... 22

IV:  FACIAL CHALLENGES TO 2007 CODE AND MORATORIUM ARE MOOT ............. 24

V:  PLAINTIFFS' RLUIPA AND § 1983 CLAIMS FAIL ........................................ 24

    A.   No Alleged Substantial Burden on or Exclusion of Religious
       Exercise or Restriction on Freedom of Association (Claims 1, 5, & 6) ...... 24

    B.   No Alleged Violation of RLUIPA "Exclusions and Limits" (Claim 4) ...... 28

    C.   No Alleged Violation of RLUIPA "Equal Terms" (Claim 2) ..................... 28

    D.   No Discrimination in the Site Plan Review Process (Claims 3 & 8) ........... 30

    E.   No Due Process Claim (Claim 7) ............................................................. 31

        1.   *No Property Interest* ..................................................................... 32

        2.   *No Plausible Allegation of Conscience-Shocking Conduct* ............ 33

        3.   *No Alleged Procedural Due Process Violation*……………………34

VI:  PLAINTIFFS' FHA CLAIMS FAIL (CLAIM 9) .................................................. 34

CONCLUSION ................................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**

*Ahmed v. Town of Oyster Bay*, No. 12-CV-3654 (JFB)(WDW),
 2014 WL 1092363 (E.D.N.Y. Mar. 18, 2014) .......................................................... 33

*Altman v. Bedford Cent. Sch. Dist.*,
 245 F.3d 49 (2d Cir. 2001) ................................................................................... 24

*Amid v. Vill. of Old Brookville*, No. CV 11-3800,
 2013 WL 527772 (E.D.N.Y. Feb. 7, 2013) ............................................................... 30

*AMSAT Cable Ltd. v. Cablevision of Conn.*,
 6 F.3d 867 (2d Cir.1993) ...................................................................................... 20

*Anderson v. Creighton*,
 483 U.S. 635 (1987) ...................................................................................... 18, 19

*Ashcroft v. al-Kidd*,
 563 U.S. 731 (2011) .............................................................................................. 18

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .............................................................................................. 20

*Assoc. Gen. Contractors of Conn., Inc. v. City of New Haven*,
 41 F.3d 62 (2d Cir. 1994) ...................................................................................... 24

*Cent. UTA of Monsey v. Vill. of Airmont, New York*,
 No. 18 CV 11103 (VB), 2020 WL 377706 (S.D.N.Y. Jan. 23, 2020) ........................ 23

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*,
 768 F.3d 183 (2d Cir. 2014) .................................................................................. 30

*Chamberlain v. City of White Plains*, 12-CV-5142 CS,
 12-CV-5142 CS, 2013 WL 6477334 (S.D.N.Y. Dec. 10, 2013) ................................ 18

*City of Cleburne v. Cleburne Living Center*,
 473 U.S. 432 (1985) .............................................................................................. 30

*Civil Liberties for Urban Believers v. City of Chicago*,
 342 F.3d 752 (7th Cir. 2003) ........................................................................ 25, 26, 27

*Cleveland Bd. of Educ. v. Loudermill*,
 470 U.S. 532 (1985) .............................................................................................. 34

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) .................................................................................................... 33

*Dean Tarry Corp. v. Friedlander*,
  826 F.2d 210 (2d Cir. 1987) ...................................................................................... 33

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
  282 F.3d 83 (2d Cir. 2002) ........................................................................................ 20

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*,
  316 F.3d 357 (2d Cir. 2003) ...................................................................................... 34

*Ferran v. Town of Nassau*,
  471 F.3d 363 (2d Cir. 2006) ...................................................................................... 33

*Fighting Finest, Inc. v. Bratton*,
  95 F.3d 224 (2d Cir. 1996) ........................................................................................ 25

*Fortress Bible Church v. Feiner*,
  694 F.3d 208 (2d Cir. 2012) ...................................................................................... 25

*Gagliardi v. Vill. of Pawling*,
  18 F.3d 188 (2d Cir.1994) .......................................................................................... 32

*Glacken v. Inc. Vill. of Freeport*,
  No. 09 CV 4832 DRH AKT, 2012 WL 894412 (E.D.N.Y. Mar. 15, 2012) ............................ 17

*Goetz v. Windsor Cent. Sch. Dist.*,
  593 F. Supp. 526 (N.D.N.Y. 1984) ............................................................................. 17

*Hale O Kaula Church v. Maui Planning Comm'n*,
  229 F.Supp.2d 1056 (D. Haw. 2002) ......................................................................... 26

*Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*,
  981 F.2d 50 (2d Cir. 1992) ........................................................................................ 24

*Hellenic Am. Neighborhood Action Comm. v. City of New York*,
  101 F.3d 877 (2d Cir. 1996) ...................................................................................... 34

*Konikov v. Orange Cty.*,
  410 F.3d 1317 (11th Cir. 2005) ................................................................................. 25

*Lamar Adver. Of Penn LLC v. Pitman*,
  573 F. Supp. 2d 700 (N.D.N.Y. 2008) ....................................................................... 32

*Landow v. Wachovia Sec., LLC,*
  966 F. Supp. 2d 106 (E.D.N.Y. 2013).................................................................. 2

*LeBlanc-Sternberg v. Fletcher,*
  922 F. Supp. 959 (S.D.N.Y.)................................................................................ 2, 3

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ..................................... 22, 23

*MacPherson v. Town of Southampton,*
  2013 WL 6058202 (E.D.N.Y. Nov. 14, 2013) ..................................................... 23

*Magee v. Nassau Cnty Med. Ctr.,*
  27 F. Supp. 2d 154 (E.D.N.Y. 1998).................................................................... 2

*Melito v. Experian Mktg. Sols., Inc.,*
  923 F.3d 85 (2d Cir.)........................................................................................... 22

*MetroPCS New York LLC v. City of Mount Vernon,*
  739 F. Supp. 2d 409 (S.D.N.Y. 2010) ................................................................. 20

*Mhany Management, Inc. v. County of Nassau,*
  819 F.3d 581 (2d Cir. 2016) ................................................................................ 35

*Missere v. Gross,*
  826 F. Supp. 2d 542 (S.D.N.Y. 2011) ................................................................. 32

*Mitchell v. Forsyth,*
  472 U.S. 511 (1985) ............................................................................................ 18

*Mitchell v. Shane,*
  350 F.3d 39 (2d Cir. 2003) .................................................................................. 34

*Monell v. NYC Dep't. of Social Servs.,*
  436 U.S. 658 (1978) ............................................................................................ 20

*Montalbano v. Port Auth. of New York & New Jersey,*
  843 F. Supp. 2d 473 (S.D.N.Y. 2012) ................................................................. 34

*Mullenix v. Luna,*
  136 S. Ct. 305 (2015) .......................................................................................... 19

*Murphy v. New Milford Zoning Comm'n,*
  402 F.3d 342 (2d Cir.2005).................................................................................. 21, 22

*N. Shore Steak House, Inc. v. Bd. of Appeals of Inc. Vill. of Thomaston*,
   30 N.Y.2d 238 (1972) ........................................................................................ 16

*Natale v. Town of Ridgefield*,
   170 F.3d 258 (2d Cir. 1999) ........................................................................ 31, 32

*Nat'l Org. for Marriage, Inc. v. Walsh*,
   714 F.3d 682 (2d Cir. 2013) .............................................................................. 20

*Okoh v. Sullivan*,
   441 F. App'x 813 (2d Cir. 2011) ........................................................................ 30

*Osborne v. Fernandez*,
   No. 06-CV-4127CSLMS, 2009 WL 884697 (S.D.N.Y. Mar. 31, 2009) .................. 21

*Pani v. Empire Blue Cross Blue Shield*,
   152 F.3d 67 (2d Cir. 1998) .................................................................................. 2

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ........................................................................................... 18

*Pena v. DePrisco*,
   432 F.3d 98 (2d Cir. 2005) ................................................................................ 33

*Petruso v. Schlaefer*,
   312 F. App'x 397 (2d Cir. 2009) ........................................................................ 32

*Powell v. McCormack*,
   395 U.S. 486 (1969) ........................................................................................... 24

*Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
   138 F. Supp. 3d 352 (S.D.N.Y. 2015) ........................................................... 25, 26

*Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
   915 F. Supp. 2d 574 (S.D.N.Y. 2013) ............................................................ 28, 29

*Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*,
   945 F.3d 83 (2d Cir. 2019) ............................................................................ 22, 23

*Reichle v. Howards*,
   566 U.S. 658 (2012) ........................................................................................... 19

*R-Goshen LLC v. Andrews*,
   115 F. App'x 465 (2d Cir. 2004) ........................................................................ 17

*R-Goshen LLC v. Vill. of Goshen*,
    289 F. Supp. 2d 441 (S.D.N.Y. 2003) ..................................................... 17, 21

*Rivera-Powell v. New York City Bd. of Elections*,
    470 F.3d 458 (2d Cir. 2006) ..................................................................... 31

*Rocky Point Drive-In, LLP v. Town of Brookhaven*,
    21 N.Y.3d 729 (N.Y. 2013) ....................................................................... 27

*Roman Catholic Bishop of Springfield v. City of Springfield*,
    760 F.Supp.2d 172 (D. Mass. 2011) .......................................................... 26

*Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*,
    128 F. Supp. 3d 566 (E.D.N.Y. 2015) ........................................................ 29

*Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*,
    2012 WL 1392365 (E.D.N.Y. Apr.23, 2012) .............................................. 24

*RRI Realty Corp. v. Inc. Vill. of Southampton*,
    870 F.2d 911 (2d Cir. 1989) ................................................................. 32, 33

*Ruston v. Town Bd. for Town of Skaneateles*,
    No. 5:06-CV-927(FJS/GHL), 2009 WL 3199194 (N.D.N.Y. Sept. 30, 2009) ......... 31

*S & R Dev. Estates, LLC v. Bass*,
    588 F. Supp. 2d 452 (S.D.N.Y.2008) ......................................................... 21

*Salvage Transp., Inc. v. Wheelabrator Envl. Sys., Inc.*,
    155 F.3d 59 (2d Cir. 1998) ......................................................................... 2

*San Jose Christian Coll. v. City of Morgan Hill*,
    360 F.3d 1024 (9th Cir. 2004) .................................................................... 25

*Scaccia v. Stamp*,
    700 F. Supp. 2d 219 (N.D.N.Y. 2010) ....................................................... 33

*Schubert v. City of Rye*,
    775 F. Supp. 2d 689 (S.D.N.Y. 2011) .......................................................... 2

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ................................................................................. 25

*Sheri Torah, Inc. v. Vill. of S. Blooming Grove*,
    No. 10 CIV. 3762 LAP, 2013 WL 1454953 (S.D.N.Y. Mar. 28, 2013) ....................... 2

*Tavares v. N.Y.C. Health & Hosps. Corp.*,
  No. 13-CV-3148 PKC MHD, 2015 WL 158863 (S.D.N.Y. Jan. 13, 2015) ................................. 2

*Third Church of Christ, Scientist, of New York City v. City of New York*,
  626 F.3d 667 (2d Cir. 2010) ........................................................................................ 29

*Thomas v. Union Carbide Agr. Prod. Co.*,
  473 U.S. 568 (1985) ..................................................................................................... 20

*Toussie v. Town Bd. of Town of E. Hampton*,
  2010 WL 597469 (E.D.N.Y. Feb. 17, 2010) ............................................................. 2

*Turkmen v. Hasty*,
  789 F.3d 218 (2d Cir. 2015) ........................................................................................ 18

*U.S. v. Vill. of Airmont*,
  925 F. Supp. (the "1996 Order") ............................................................................... 2

*Vertical Broad, Inc. v. Town of Southampton*,
  84 F. Supp. 2d 379 (E.D.N.Y. 2000) ................................................................... 32, 33

*Washington v. Glucksberg*,
  521 U.S. 702, 720 (1997) (1997) ............................................................................. 33

*Washington v. Gonyea*,
  731 F.3d 143 (2d Cir. 2013) ........................................................................................ 17

*Westchester Day Sch. v. Vill. of Mamaroneck*,
  504 F.3d 338 (2d Cir. 2007) ........................................................................................ 25

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*,
  473 U.S. 172 (1985) ..................................................................................................... 21

*Witt v. Vill. of Mamaroneck*,
  992 F. Supp. 2d 350 (S.D.N.Y. 2014) ...................................................................... 32

*Wright v. Nypd Officer Michael Manetta*,
  No. 14-CV-8976 (KBF), 2016 WL 482973 (S.D.N.Y. Feb. 5, 2016) ...................... 30

*Yale Auto Parts, Inc. v. Johnson*,
  758 F.2d 54 (2d Cir.1985) ........................................................................................... 32

**Statutes**

42 U.S.C. § 2000cc ................................................................................................. 24, 28, 29
42 U.S.C. § 3604(a) .......................................................................................................... 34
N.Y. Mun. Home Rule Law § 10(4)(b) ............................................................................ 27
N.Y. Vill. Law § 7-725 ........................................................................................ 11, 26, 32

**Rules**

Fed. R. Civ. P. 11 ............................................................................................................. 11

## PRELIMINARY STATEMENT

The Village of Airmont (the "Village") respects the right of every resident to practice their faith. All residents are free to pray anywhere in the Village without restriction. And any resident may use their single-family home as a regular gathering space for group prayer, so long as the site can support the health, safety, and welfare of all who gather there. The Village Code strikes a balance: "to promote individual constitutional rights to freedom of religion, freedom of assembly and the protection of the health, safety and welfare of its citizens." Vill. Code § 210-12.2(A). Residential places of worship get the same review process as all other site plan applications, but the Village *also* gives such applicants priority in the scheduling of agenda items and hearings and in rendering of all decisions. In Airmont, by statute, people seeking to use their home for congregational worship go to the front of the governmental land-use review line.

Plaintiffs reject the Village's authority to regulate health and safety in this area. They want to operate residential places of worship—some already do—with none of the process, oversight, or regulation mandated by state and local law. They have applied to the Village—two proposed to expand their homes by over *3000 square feet*—but no Plaintiff has seen the process through to the completion. Instead of submitting a complete application and receiving a final decision, or pursuing administrative relief to ripen their claims, Plaintiffs abandoned the process and ran to federal court with premature and baseless claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), Fair Housing Act ("FHA"), and U.S. Constitution. But as the history of the Village's Zoning Code and the public record of their site plan applications make clear, Plaintiffs' claims of religious discrimination ring hollow. The Court should dismiss this case in its entirety.

## STATEMENT OF FACTS[1]

### I.    The Origin of the Village's "Residential Place of Worship" Law

The "Residential Place of Worship" law is a creation of the federal courts and the Justice

Department. In 1996, District Judge Gerard Louis Goettel ordered the Village to revise its Zoning

Code "so that it will not be construed to prevent home worship, or to prevent persons from walking

to and from religious services at such places of worship, or to prevent home worship services on

any day in all residential zones." *LeBlanc-Sternberg v. Fletcher*, 922 F. Supp. 959, 965 (S.D.N.Y.),

*judgment entered sub nom. U.S. v. Vill. of Airmont*, 925 F. Supp. 160 (S.D.N.Y. 1996), *and aff'd*

*sub nom. LeBlanc-Sternberg v. Fletcher*, 104 F.3d 355 (2d Cir. 1996). Judge Goettel specifically

ordered the Village to create a use category called "Residential Place of Worship" ("RPW"), to

define it as "[a]n area located within a residence that is used for the conducting of religious

services," and to permit the use "by right on any day in all residential zones." *U.S. v. Vill. of*

*Airmont*, 925 F. Supp. at 161 (the "1996 Order"). On April 29, 1996, the court amended the 1996

Order "to clarify that there is not an absolute right to operate a [RPW]." *Vill. of Airmont v. U.S.*,

No. 98 CIV. 3801 (CM), 1999 WL 123384, at *1 (S.D.N.Y. Feb. 5, 1999).

---

[1] On a motion to dismiss for failure to state a claim, the court may consider the complaint, documents attached thereto and incorporated by reference therein, and matters of public record. *See Auto. Salvage Transp., Inc. v. Wheelabrator Envl. Sys., Inc.*, 155 F.3d 59, 67 (2d Cir. 1998); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *Magee v. Nassau Cnty Med. Ctr.*, 27 F. Supp. 2d 154, 160 (E.D.N.Y. 1998). Matters of public record include, *inter alia*, Village meeting minutes. *See Sheri Torah, Inc. v. Vill. of S. Blooming Grove*, No. 10 CIV. 3762 LAP, 2013 WL 1454953, at *2 (S.D.N.Y. Mar. 28, 2013) (taking judicial notice of village board meeting minutes); *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 695 (S.D.N.Y. 2011) (considering public meetings minutes that "form the core of Plaintiffs' allegations" and because "the minutes … are matters of public record."). "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] . . . which is integral to the complaint, the defendant may produce [it] when attacking the complaint for its failure to state a claim, because plaintiff should not be allowed to escape the consequences of its own failure." *Toussie v. Town Bd. of Town of E. Hampton*, 2010 WL 597469, at *3 (E.D.N.Y. Feb. 17, 2010); *see also Tavares v. N.Y.C. Health & Hosps. Corp.*, No. 13-CV-3148 PKC MHD, 2015 WL 158863, at *3 (S.D.N.Y. Jan. 13, 2015). ("While a court deciding a motion to dismiss must generally accept the complaint's factual allegations as true, it is permitted to reject the truthfulness of those allegations when they are contradicted by matters of which judicial notice may be taken, such as matters of public record."); *Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 120 (E.D.N.Y. 2013) ("The plain purpose of th[is] exception is to prevent plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting.").

From the start, the Village was concerned this broad language "requested by the [federal] government … could completely eviscerate its zoning code." *LeBlanc-Sternberg*, 922 F. Supp. at 964. Nonetheless, it enacted the revisions of the 1996 Order. Ex. A at 142.[2]

The Village's concern quickly materialized—a resident tried to use the very broad RPW provision to skirt state safety and local zoning regulations, to build a full-scale synagogue on a residential lot in a residential zone. The Village received a RPW application for "a 16,580 square foot building" for RPW use. *Vill. of Airmont v. U.S.*, 1999 WL 123384, at *1. "Under the New York State Uniform Fire Prevention and Building Code and the Village Zoning Code, a building of this size, if denominated a place of public accommodation (as most houses of worship and other public places are), would be subject to numerous construction, safety and occupancy standards under State law, as well as to site plan approval under Airmont's existing Zoning Code. However, if this edifice in fact qualifie[d] as a 'Residential Place of Worship,' then it [was] possible that the Building Inspector must issue a permit for its construction subject only to the much less stringent rules that apply to residential construction." *Id*.

In 1998, the Village returned to court, asking to modify its Code to address the health and safety implications of the 1996 Order. *See Vill. of Airmont v. U.S.*, No. 98 Civ. 3801 (CM).[3] It proposed requiring RPW's to comply with "the applicable provisions of the New York State Code of Rules and Regulations and the Uniform Fire Prevention and Building Code" and to conform with the "area and bulk requirements applicable to a single family residence in the district in which

---

[2] Referenced exhibits are annexed to the accompanying Declaration of Alexander J. Eleftherakis.

[3] The Village initially sought to amend its code by filing a new action for declaratory relief against the federal government. *See Vill. of Airmont v. U.S.*, No. 98 Civ. 3801 (CM). The court found it lacked jurisdiction over the action and dismissed it "without prejudice to the Village of Airmont's right to apply for modification of the injunction in *United States v. Village of Airmont,* 91 Civ. 8453." *See Vill. of Airmont v. U.S.*, 1999 WL 123384, at *4. The Village then exercised that right. *See U.S. v. Vill. of Airmont*, 91 Civ. 8453, ECF No. 31.

the building or structure is situated." *Vill. of Airmont v. U.S.*, 1999 WL 123384, at *2.

In 2000, the Village and the federal government agreed to certain proposed amendments to the Code (the "Amendments Stipulation"). Ex. B. They agreed the Village would apply them to a pending RPW application as a "test case"—before they became law—to assess how the proposed changes worked. *Id.* at 2. "Both the Government and the Village reserve[d] their rights to propose additional modifications to the Amendments Stipulation after the processing of [the pending] application [was] concluded." *Id.* District Judge Colleen McMahon so-ordered the stipulation on September 19, 2000. *See U.S. v. Vill. of Airmont*, 91 Civ. 8453, ECF No. 31.

The then-proposed provisions are essentially the same as those Plaintiffs challenge now. Under the proposal, RPW applications would undergo the same review as all other site plan applications. Ex. B at 8–10. Specifically, the amendments provided:

> For the establishment of any [RPW] that exceeds 1400 square feet, an applicant shall obtain site plan approval as set forth elsewhere in this Code. For the establishment of any [RPW] that is 1400 square feet or less, an applicant shall apply for site plan review pursuant to this section of the Code.

*Id.* at 8, ¶ A. The amendments required all applications to include "a proposed plan for the use and development of the site … [with] details regarding water, sewage, parking, traffic, driveway, fire and emergency, buffering for neighbors, and drainage." *Id.* at 9, ¶ E

Under the amendments, all RPW applications would receive priority in the scheduling of agenda items and rendering of decisions. *Id.* at 10, ¶ L. The amendments also included an "expedited" review procedure for applications "providing for 1,400 square feet of space or less devoted to the conducting religious services." *Id.* at 9, ¶ G.

The procedure included initial referral to the Village Community Design Review Committee ("CDRC"), before Planning Board ("PB") review. *Id.* The CDRC is an advisory panel of "Village departments, agency officials and consultants retained by the Village for the purpose

4

of reviewing and evaluating applications or proposals and advising [Village] boards and agencies." Ex. C, § 210-174. It provides technical knowledge and expertise to help both the Village and the applicant through the land-use review process. The CDRC is not empowered—and does not purport—to take dispositive action on any application or to exercise any function vested by law in the PB or any other Village agency. For site plan applications, the CDRC is empowered only to make a non-binding determination as to whether an application is "complete," *i.e.*, ready for Planning Board review. *Id.*, §§ 210-74(A)(1)(a), (B)(1)–(2).

Under the expedited procedure, the PB would be required to issue a determination "within sixty-two (62) days of [its] receipt of a *completed* application." Ex. B, ¶ I (emphasis added).

In 2007, the Village passed a law "Amending Article III, Section 210-12A of the Village of Airmont Zoning Law with respect to establishment of [RPW]." ¶ 44;[4] Ex. D. The 2007 Code amendments were copied nearly verbatim from the Amendments Stipulation. *Compare* Ex. B at 7–9 *with* Ex. D at 1–3. They provided the same site plan procedure with priority treatment for RPW applications. Ex. D at 1–3. The Village clarified a provision governing applications for RPW "within the structure of an existing residence that is non-confirming with the area and bulk table requirements of the district in which such residence is located." *Compare* Ex. B at 7, ¶ D *with* Ex. D at 1–2, ¶ 4. It also harmonized previously inconsistent paragraphs and made clear the expedited review applied only to applications providing for 1,400 square feet of space or less devoted to the conducting of religious services. *Compare* Ex. B at 8, ¶¶ G & I *with* Ex. D at 2–3, ¶¶ 7 & 9. And it revised the definition of RPW to be "a dedicated building, or any part thereof, where a group of people assemble in a congregation to perform acts of religious, praise, honor or devotion. It also includes places where religious instructions, ceremonies, and associated activities of faith are

---

[4] All citations to "¶" refer to paragraphs of the FAC.

carried out." *Id*. at 3.

The amendments took effect on December 17, 2007 upon filing with the New York State Department of State. Ex. E; *see also* Ex. F, § 210-12.1. The federal government never challenged or otherwise opposed these the amendments while they were in effect.

## II.    The Application of Rabbi David Ribiat

Ribiat lives in a 2,476 square foot house in the Village. ¶ 89; Ex. G, ¶ 6. In March 2016, he decided his home "was not large enough to host prayer meetings for his neighbors," so he proposed to construct a 2,845 square foot structure on his property for use as a RPW and to increase his living space. ¶ 89. He met with the former building inspector, Ian Smith, who told him the Code did not permit such a large building on his lot and that, in addition to site plan approval from the PB, Ribiat would need variance from the Village Zoning Board of Appeals ("ZBA").[5] ¶ 91.

Sometime later, Ribiat filed a proposal to construct a 3,968 square building on his property. ¶ 92; Ex. G. The structure was sixty percent larger than the existing residence and more than doubled the existing footprint. *Id*., ¶ 5. He proposed 2,164 square feet for RPW use and 1,804 square feet for residential use. *Id*., ¶ 6. He did not seek permission to use any portion of his existing residence for group worship. *Id*., ¶ 5.

The CDRC reviewed Ribiat's proposal on August 9, 2016. ¶ 92; Ex. G. The Village Engineer said the proposal seemed to fall under the definition of a Freestanding Place of Worship, which the Code defined as a "building or structure used exclusively for the conducting of organized religious services, except that a portion of the building or structure may be dedicated as living quarters for clergy and their families." *Id*., ¶¶ 4–5; Ex. F, § 210-174. Ribiat's engineer "agreed he need[ed] to clarify the criteria" applicable to the proposal. Ex. G, ¶ 5. The Village Engineer also

---

[5] In 2007, as now, the Code empowered the ZBA to grant variance applications. *See* Ex. F, § 210-158(C).

expressed her concern that, regardless of the proposed use, the structure was too large to be sited on the lot, which is undersized for its zoning district. *Id.*, ¶ 7. She also noted the lot's topography presented significant development issues; specifically, there is a 26-foot elevation differential from the front to the back of the lot, which would have to be re-graded to accommodate the structure and parking. *Id.*, ¶ 7–8. She advised Ribiat the grading required for his proposal "will be substantial and costly." *Id.*, ¶ 7. She also noted a "good deal of the property has been filled and needs to be reflected on the plan." *Id.*, ¶ 8. In order to truly assess the proposal, the CDRC asked for various items, including layout plans showing the existing and proposed uses. *Id.*, ¶¶ 10, 15.

On September 13, 2016, Ribiat returned to the CDRC with a new proposal. ¶ 95; Ex. H. He provided a hand-drawn sketch[6] and conceptual plan showing a reduced area devoted to RPW use. ¶ 95; Ex. H at 1. He did not provide the requested layout plan. *Id.* The Village Engineer again raised her concern regarding the lot's topography, noting the proposed parking area had "a tremendous grade differential coming in from the road." *Id.*, ¶¶ 2, 8. She also noted the fill on the property "was not intended for a structure" to be built on top of it and would have to be removed. *Id.*, ¶ 2. At the close of the meeting, Ribiat agreed to provide several items needed to assess his proposal including, *inter alia*, the previously requested layout plan, seating and architectural plans, a plan showing the existing topography of the lot, an environmental assessment form ("EAF"), and plans for all proposed grading and drainage. *Id.*, ¶ 10.

In December 2016, Ribiat submitted an updated proposal. ¶ 97; Ex. I. It included an "updated narrative," which indicated, "[a]t the [September 13, 2016 CDRC] meeting the concept plan was discussed using drawing created by applicant for discussion purposes only. Applicant was advised to return with actual an updated site plan, including lighting, drainage, landscaping

---

[6] Ribiat falsely claims he submitted "professional architectural plans" in September 2016. ¶ 95.

and architectural renderings….” *Id*. Ribiat purported to submit all requested plans. *Id*.

The CDRC discussed the submission at its next meeting on January 10, 2017 and identified several deficiencies. Ex. J. The plans still did not show the existing grading on the site, and Ribiat still had not provided the requested drainage calculations. *Id*. at 1, ¶¶ 1, 4. The CDRC also noted the floor plans did not match the proposed occupancy load or parking demand. *Id*., ¶ 3. Nor did the site plan match the architectural plan. *Id*., ¶ 11. The CDRC again requested various items needed to properly assess the proposed construction. *Id*. at 2, ¶ 12.

Ribiat returned to the CDRC on April 6, 2017. ¶ 98; Ex. K. The main item of discussion was that the proposed structure’s basement level; Ribiat intended to use it in part as a child’s playroom, but it did not did not have an exit to the outside and, thus, posed a fire-safety issue. *Id*. The parties discussed potential changes to basement level. *Id*. After noting several technical issues that still needed to be addressed (primarily “to define the square footage of the basement” and provide updated architectural plans), the CDRC and Ribiat’s representatives agreed he would submit a site plan application to the PB. *Id*.; ¶ 100.

Ribiat submitted his site plan application to the PB on April 20, 2017. Ex. L. On May 23 and 24, 2017, the Village Engineer and Village Planner provided their comments for the PB’s consideration. ¶ 103; Ex. M; Ex. N. The Engineer noted, “[t]he architectural plan indicates one level, approx. 60 feet 6 inches by 31 feet or 1875.5 SF will be dedicated to the residential house of worship use.” Ex. M at 1. She also reiterated concerns with the proposed parking area, which indicated “a 10 % grade which is excessive in a parking lot and not acceptable.” *Id*. at 1–2, ¶¶ 3–8. The Planner identified “deficiencies [in] and necessary edits” to Ribiat’s EAF. Ex. N at 1.

The PB heard Ribiat’s site plan application for the first time on May 25, 2017. ¶¶ 103–04; Ex. O. Among other items, the PB raised concerns regarding the proposed parking area. *Id*. at 3.

Ribiat's son said "the parking area is in question as there are small slopes and if they make them regular spaces then they will require a retaining wall as it will slope every [sic] badly." *Id*. The applicant agreed to return to the CDRC to assess the parking issues. *Id*. The Village Planner raised the deficiencies in Ribiat's EAF. *Id*. Ribiat's attorney said the applicant "will address all items and update the EAF." *Id*. The PB voted to continue the hearing at its next meeting. *Id*. at 5.

Ribiat met with the CDRC on June 13, 2017 to discuss the parking and grading issues. ¶ 106; Ex. P. His representatives agreed to make some changes and re-submit to the PB. *Id*. at 2.

The PB put Ribiat's application on the agenda for its August 24, 2017 and September 28, 2017 meetings, but Ribiat requested adjournments for both dates. Ex. Q; Ex. R. Ribiat's application next appeared before the PB on February 22, 2018, represented by a new engineer. ¶ 114; Ex. S. The engineer submitted *new* plans and indicated the proposal required at least nine variances. *Id*. at 1–2. The Village Engineer noted several items in the new plans (layout, parking, drainage, and grading) needed clarification. *Id*. at 2. She advised the PB and new engineer that Ribiat needed to specify the proposed use of all areas on the architectural plans. She suggested he fix the plan and then determine whether the number of required variances would be reduced. *Id*. The new engineer requested two weeks to gather the request items. *Id*. at 3. Following public comment, the Planning Board voted to continue the hearing at its next meeting. *Id*. at 4.

Ribiat's representatives returned to the PB on March 29, 2018. ¶ 115; Ex. T. Ribiat's engineer presented a proposal for a 1,108 square foot RPW. *Id*. at 1. She noted Ribiat's undersized lot meant the proposal would require a size variance. *Id*. The Building Inspector ("BI") advised Ribiat's study and library should be calculated into the worship space, bringing the total area to 1,552 and requiring one more variance, bringing the total number of required variances to eleven. *Id*. The Village Planner advised Ribiat needed to submit additional information for the PB to

complete the required SEQRA process, including building calculations and corrected architectural plans. *Id*. at 1–2. The PB voted to continue the hearing at its next meeting. *Id*. at 3. The PB put Ribiat's application on the April 26, 2018 meeting agenda, but he requested an adjournment. Ex U. He never returned to the PB.

### III.    The Application of Rabbi Moishe Berger

Berger owns a residence located at 22 Rustic Drive in the Village. ¶ 122; Ex. V. Sometime between August and December 2015, Berger started using his garage to operate a RPW without site plan approval or a certificate of occupancy ("CO") for such use. ¶ 124.

In December 2015, Berger submitted a conceptual plan "to convert about 600 sq. feet of [his] residence" for use as a RPW. ¶ 125; Ex. W. The CDRC reviewed the concept on January 12, 2016. ¶ 125; Ex. V. The CDRC advised Berger to submit a layout plan of the proposed worship space. *Id*. at 1, ¶ 2. The Village Engineer noted Berger needed "to develop a site plan as [his submission was] just a concept plan that [was] rather incomplete." *Id*., ¶ 3. After discussing the need for variances and issues of parking and fire safety, the CDRC advised Berger to submit various items needed to assess his conceptual proposal. *Id*. at 1–2, ¶¶ 5–9.

Berger submitted a site plan and returned to the CDRC on March 8, 2016. Ex. X. The CDRC identified some items that needed clarification, including parking, emergency access, drainage, and grading. *Id*. at 1–2. Berger agreed to return to the CDRC with, *inter alia*, "a much more detailed narrative" of his proposal. *Id*. at 2, ¶ 13.

*Six months later*, Berger submitted a *new* proposal, which the CDRC reviewed on October 11, 2016. ¶ 128; Ex. Y. He now proposed—for the first time—to build a two-floor addition to his house for RPW and residential use. *Id*. at 1, ¶ 1. The CDRC noted the proposal required several variances. *Id*. at ¶ 2. They also noted the floor plan did not match the new site plan and the

architectural plans did not show the new addition. *Id*., ¶ 3. After further discussion, Berger agreed to return to the CDRC with a corrected and more detailed proposal. *Id*., ¶¶ 4–19.

Berger submitted revised plans in December 2016 and returned to the CDRC on January 10, 2017. ¶ 129; Ex. Z. His engineer noted he had "moved the parking and [would] come back [to the CDRC] with a full set of plans if viable." *Id*. at 1., ¶ 2. The Village Engineer advised Berger his plans did not show any access to the proposed building. *Id*., ¶ 6. The CDRC also noted he still had not provided appropriate architectural plans. *Id*., ¶ 8. The panel advised Berger to submit items needed to assess his proposal, including floor plans and architectural plans. *Id*. at 1–2, ¶ 11.

Berger returned to the CDRC on April 6, 2017. ¶ 130; Ex. AA. After discussing several technical items that still needed to be addressed (including fire prevention, drainage, and occupancy requirements), the CDRC and Berger agreed the next step was to submit an application with the recommended revisions to the PB. *Id*. at 1.

At the CDRC meeting, BI Louis Zummo asked if Berger was operating a RPW. *Id*. at 1. Berger said he was. *Id*. The BI advised Berger that doing so without a CO was illegal. *Id*. at 1–2.

Berger appeared before the PB on June 22, 2017. ¶ 131; Ex. BB. He presented plans to construct a 3,080 square foot house of worship. *Id*. at 3. The Village Planner informed the PB that the BI, who was not present (*see id*. at 1), questioned whether the structure classified as a RPW or as a Freestanding House of Worship. *Id*. at 3. The Deputy Village Attorney advised the PB it could not complete the State Environmental Quality Review Act ("SEQRA") review[7] without a decision from the BI. *Id*. The PB voted to continue hearing the application at its next meeting. *Id*. at 4.[8]

Berger's application was on the agenda for the PB's July 27, 2017 meeting, Ex. CC, but

---

[7] State law requires site plan review to comply with SEQRA. *See* N.Y. Vill. Law § 7-725-a(10).

[8] Berger's claim that the PB "rejected" his application on June 22, 2017 is false and violates Fed. R. Civ. P. 11. ¶ 131.

Berger requested an adjournment because "some of the requested items will not be ready." Ex. DD. He was placed on the PB's August 24, 2017 meeting agenda but again requested an adjournment. Ex. Q.

In December 2017, the BI determined the proposed structure was too large to classify as a RPW under the Code. ¶ 134; Ex. EE. Village residents have the right to appeal any determination of the BI to the ZBA. *See* Ex. F, § 210-154. Berger has never appealed to the ZBA either for review of or a variance from the BI's interpretation of the Code. Berger never returned to the PB.

On February 14, 2018, the Village Code Enforcement Officer ("CEO") issued a notice of violation ("NOV") to Berger for failing to have a valid CO. ¶ 135; Ex. FF; Ex. GG, § 80-12 (CO required "for both initial and continued occupancy and use of the building or land to which it applies, for the purposes therein stated."). The NOV instructed Berger, "It is your responsibility to arrange for the correction of the above state violation(s) prior to the resolve-by date of March 16, 2018. Contact this office at 845-357-8111 to arrange for an inspection. Failure to do so will result in the issuance of a Court Appearance Ticket and possible fines for each day the violation is not resolved." Ex. FF. Berger never arranged for an inspection, nor did he appeal the NOV to the ZBA. ¶ 136. On March 19, 2018, the CEO issued an appearance ticket. ¶ 138. Berger does not claim the Village ever prosecuted the violation or that he ever appealed it to the ZBA. Ex. GG, § 80-17.

## IV.    The Application of Rabbi Abraham Horowitz

In 2007, Horowitz started operating a RPW without site plan approval or a CO. ¶ 142. In June 2008, the Village directed him to apply for approval to legalize his RPW. *Id.* In September 2011, the Village CEO issued an appearance ticket to Horowitz for violating the Zoning Code's CO requirement. ¶ 143; Ex. HH.

Horowitz appeared at the CDRC with a proposal on June 12, 2012. ¶ 144; Ex. II. The

CDRC identified several issues, including that the proposed parking was "dangerous" and did "not meet Village code." *Id.* The CDRC advised him to submit a more detailed plan. *Id.* Nearly a year later, on May 7, 2013, Horowitz returned to the CDRC. Ex. JJ. After discussing various items, including complaints from community members about "illegal parking" at the site, Horowitz agreed to review the panel's comments and return to CDRC with updated plans. *Id.*, ¶ 14

Six months later, on November 12, 2013, Horowitz returned to the CDRC. Ex. KK. The Village Engineer requested a floor plan of the worship area and a full site plan. *Id.*, ¶¶ 3–4. Horowitz agreed. *Id.*, ¶ 10. Horowitz returned to the CDRC four months later, on March 11, 2014. ¶ 146; Ex. LL. The "Village Engineer stated that since 2012 the Committee has been requesting the proposed floor seating plan and have not received it to date." *Id.*, ¶ 3. The CDRC and Horowitz agreed he would make certain changes and submit to the PB. *Id.*

Almost a full year later, Horowitz submitted his proposal to the PB and appeared before the board on February 26, 2015. ¶ 147; Ex. MM. The PB noted Horowitz *still* had not provided floor plans, which were "necessary to confirm the overall square footage of [the] worship area and for parking calculations and should be provided." *Id.* at 3. Following a discussion of SEQRA and public comment, the PB voted to continue the public hearing at its next meeting. *Id.* at 3, 5.

On July 16, 2015, former Village CEO Kim Weppler issued an appearance ticket to Horowitz for violating the Code's building construction and fire prevention rules by failing to obtain a Fire Safety Certificate. Ex. NN.

Horowitz returned to the PB on August 27, 2015. ¶ 148; Ex. OO. After some discussion (including regarding the need for a variance from the ZBA for the proposed driveway, *id.* at 2), the PB voted to *approve* Horowitz's application, subject to several conditions. *Id.* at 3.[9]

---

[9] Horowitz's allegation that his site plan approval "entitled" him to a CO is false. ¶ 155. Site plan approval and the of a CO are discrete matters directed at separate Village agencies. *See* Ex. F, § 210-74 (site plan procedure before PB);

A year later, in August 2016, Horowitz applied for a CO. ¶ 150. The Code vests the power to issue a CO in the BI. *See* Ex. F, § 210-149. The CO applicant must prove the structure has been approved by an engineer or architect and complies with approved plans and occupancy regulations. *Id*. § 210-149(B)(1). Before issuing a CO, the BI "shall examine or cause to be examined all buildings, structures and sites for which the application has been filed." *Id*., § 210-149(B)(2).

The BI asked Horowitz to appear before the CDRC to discuss his CO application. ¶ 150. Horowitz appeared before the CDRC on October 11, 2016 and again on December 13, 2016. ¶¶ 152–53. In early 2017, the BI and Fire Inspector ("FI") inspected Horowitz's residence. ¶ 156. The FI verbally informed Horowitz that his residence failed the inspection. ¶ 157.

In or about April 2017, Horowitz received an appearance ticket regarding the 2011 and 2015 violations issued by the former CEOs. ¶ 158. On May 4, 2017, Horowitz appeared in Village Justice Court. ¶ 159. He pled guilty and agreed to accept a fine of $3,000. ¶ 160; Ex. PP.

Contrary to the false allegations of the FAC, the May 2017 violation prosecution did not relate to the alleged violations observed at the Horowitz's residence in early 2017. Ex. PP. As the judgment shows, the prosecution related only to the 2011 and 2015 violations issued by prior CEOs, to whom Plaintiffs attribute no discriminatory animus. *Id.*

## V.    Rabbi Chaim Cahan

On September 28, 2017, Village FI Shlomo Pomeranz informed the wife of Cahan that a *sukkah* erected in front of the entrance to their home posed a fire safety risk and would need to be moved. ¶ 168. The FI returned to the residence the next day and informed Cahan directly. ¶ 170. He told Cahan the *sukkah* was a fire hazard because, *inter alia*, it obstructed entrance into and exit from the residence. *Id. see also* Ex. GG, § 80-28 ("No furnishings, decorations or other objects

Ex. F § 210-149 (issuance of CO by BI). Site plan approval is a prerequisite for issuance of a CO, Ex. F, § 210-72, but it alone does not entitle the applicant to a CO.

shall be so placed as to obstruct exits, access thereto, egress therefrom, or visibility thereof.").
Cahan moved the *sukkah* to the back of his house. ¶ 173.

## VI.    The 2018 Code Revisions

On October 3, 2016, the Village Board ("VB") established the Comprehensive Master Plan Review Commission ("CMPRC") to review and recommend updates to the Village's Comprehensive Master Plan ("CMP") and zoning code. Ex. QQ at 1. On February 8, 2017, the VB enacted Local Law No. 1-2017 ("LL 1-2017"), imposing a moratorium on development "to preserve the status quo pending the adoption of amended planning and zoning regulations" (the "Moratorium"). *Id.*; Ex. RR, § 2.[10] The Moratorium took effect on March 8, 2017. *Id.*, § 9; ¶ 57.[11]

The Moratorium expired on September 4, 2018, when the VB adopted amendments to the Code ("2018 Code"). ¶ 58. Among the amendments, the VB replaced the term RPW with the generally applicable term "Residential Places of Assembly" ("RPA"). Ex. C, § 210-12.1. The VB defined RPA as "an accessory use where organizations or loose affiliations of likeminded people conduct civic, social or religious activities more than three times per month." *Id.*, § 210-12.1(B)(2). Rather than differentiate between RPA of 1,400 square feet or less and those in excess of 1,400 square feet, the 2018 Code provides a single procedure for all RPA, which "shall not exceed the 40% of the gross floor area of a residence. *Id.*, § 210-12.1(B)(1).

---

[10] LL 1-2017 authorized the VB to extend the six-month Moratorium for another six months by resolution upon a finding of good cause. Ex. RR, § 2. On July 17, 2017, the VB exercised this authority and extended the Moratorium through March 8, 2018. Ex. SS. On March 5, 2018, the VB adopted Local Law No. 1-2018, which extended the Moratorium for three months and authorized the VB to extend it for three more months. Ex. TT. LL 1-2018 took effect on March 8, 2018. Ex. W. On June 4, 2018, the VB extended the Moratorium for three months. Ex. UU.

[11] The Moratorium did not affect any Plaintiff. Although the law prohibited the PB's consideration of "any application with respect to the approval of a site plan," Ex. RR, § 2, the PB continued to hear the applications of Ribiat and Berger while it was in effect. The PB had approved Horowitz's application before the Moratorium took effect, and Horowitz does not—and cannot—allege the law prohibited issuance of COs. In any event, LL 1-2017 permitted property owners to apply to the Village Board for administrative relief from the Moratorium. *Id.*, § 4. No Plaintiff applied for relief.

Although now permitted as a "special use,"[12] RPA applications for worship use are required to go through a site plan review procedure nearly identical to the 2007 Code (which permitted RPW "by right") and the same as all other RPA applications. *Id.*, § 210-73. Applicants must still submit plans with details regarding water, sewage, parking, traffic, driveway, fire and emergency, buffering for neighbors, and drainage. 210-73(A)–(I).

Under the 2018 Code, RPA applications for worship use still receive "priority in the scheduling of agenda items and hearings and in rendering of all decisions." *Id.* § 210-12.1(B)(14). And while the 2018 Code eliminates the expedited procedure for RPW of 1,400 square feet or less, the Zoning Code continues to require the PB to schedule a public hearing within 62 days of receiving a completed application and to render a decision within 62 days after the close of the public hearing. *Id.*, § 210-74(B)(3), (6).

No Plaintiff has applied for site plan approval under the 2018 Code. Neither Ribiat nor Berger has returned to the PB to seek approval of their prior proposals, nor have they appealed to the ZBA for a variance from the 2018 Code.

**VII.    Procedural History**

Plaintiffs commenced this action in December 2018 and filed the FAC on May 6, 2019. Conclusory and irrelevant allegations aside, Plaintiffs allege: 1) the site plan review for RPW in 2007 Code is facially invalid, even though the law is no longer in effect, explicitly permits RPW, and implemented in sum and substance the Amendments Stipulation to which the federal government agreed; 2) the 2007 Code is invalid as-applied, even though only one Plaintiff actually

---

[12] A "special use" classification "is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood." *N. Shore Steak House, Inc. v. Bd. of Appeals of Inc. Vill. of Thomaston*, 30 N.Y.2d 238, 243 (1972).

completed the site plan review process and he was *approved*; 3) the 2018 Code is facially invalid, even though the challenged amendments are nearly identical to the 2007 Code. They claim these actions violated the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), Fair Housing Act ("FHA"), and the U.S. Constitution. No claim can survive dismissal.

## ARGUMENT

## POINT I:   ALL CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS FAIL

### A.  No Individual Liability Under RLUIPA

All RLUIPA claims against the individual defendants die on the vine because RLUIPA does not permit individual liability. *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013).

### B.  No Basis for Individual Liability Under § 1983

Plaintiffs fail to state a claim for individual liability under § 1983.

#### 1.  *CDRC Members and Village Consultants are not State Actors*

CDRC Members and Village consultants are not state actors and thus cannot be held liable under § 1983, which applies only to those "acting under color of state law." "District courts within this Circuit have routinely held that where private actors merely provide consultation or advice to a municipality, they do not engage in state action." *Glacken v. Inc. Vill. of Freeport*, No. 09 CV 4832 DRH AKT, 2012 WL 894412, at *6 (E.D.N.Y. Mar. 15, 2012) (collecting cases); *see also R-Goshen LLC v. Vill. of Goshen*, 289 F. Supp. 2d 441, 445 (S.D.N.Y. 2003) ("A consultant's professional opinions and the advice he offers to municipalities are not state action and thus cannot support claims against such consultants for liability under section 1983."), *aff'd sub nom. R-Goshen LLC v. Andrews*, 115 F. App'x 465 (2d Cir. 2004). Because the CDRC members, Village Engineer, and Village Planner are consultants retained to offer technical expertise land use proposals, their conduct is not state action. Likewise, Deputy Village Attorney Daniel Kraushaar's provision of legal advice to the Village is not state action. *See Goetz v. Windsor Cent. Sch. Dist.*,

17

593 F. Supp. 526, 528 (N.D.N.Y. 1984) ("The conduct of an attorney acting in his professional capacity while representing his client does not constitute action under color of state law for the purposes of § 1983."). The Court should dismiss all claims against the CDRC and Zummo, Kraushaar, Turner, Beltrani, and Pomeranz as CDRC members and Village consultants.

2. *Qualified Immunity*

Each individual Village defendant is entitled to qualified immunity because Plaintiffs fail to allege any Village official personally violated a clearly established right.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). It "is an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 512 (1985) (emphasis original). "The Supreme Court 'repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Chamberlain v. City of White Plains*, 12-CV-5142 CS, 2013 WL 6477334 (S.D.N.Y. Dec. 10, 2013) (*quoting Pearson*, 555 U.S. at 232). The broad scope of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation and internal quotation marks omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"The Supreme Court's recent repeated unanimous awards of qualified immunity emphasize the narrow circumstances in which government officials may be held personally liable for their actions in suits for money damages." *Turkmen v. Hasty*, 789 F.3d 218, 281 n.26 (2d Cir. 2015).

18

"The dispositive question is whether the violative nature of *particular* conduct is clearly established … [and] must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasis original). "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can 'reasonably … anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson*, 483 U.S. at 639).

There is no plausible allegation any Village official intentionally violated any clearly established right. All the Village officials were applying code provisions that were based on Amendments Stipulation. The CDRC members' review of Plaintiffs' conceptual plans and provision of feedback grounded in state and local land-use law violates no clearly established right. Neither does the PB's hearing of Plaintiffs' site plan applications and requests for additional information. And neither does the BI's decision to request additional information to confirm compliance with state and local law prior to issuing a CO. A Fire Inspector's decision to have a resident remove an apparent fire hazard similarly violates no clearly established right.

Plaintiffs try to cast a shadow over these legitimate acts by claiming, *ad nauseam* and conclusorily, that each individual acted pursuant to some "unwritten policy" of anti-Hasidism. But repetition does not make this empty claim plausible. The only non-conclusory allegations of animus refer to (1) a finding from over twenty years ago against a long-gone administration, (2) a decade-old action against a prior administration that ended with no finding of liability, and (3) a facially neutral statements by non-Village officials during the CMP review. ¶¶ 76–84. Plaintiffs do not plausibly allege any individual defendant personally harbored religious animus.

### C.  The Village Boards Are Not Suable Entities

"[A]gencies of a municipality are not suable entities[; …] they are 'merely administrative arms of a municipality, [and] do not have a legal identity separate and apart from the municipality." *MetroPCS New York LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 419 (S.D.N.Y. 2010). The Court should dismiss all claims against the VB, PB, ZBA,[13] and Building Department.[14]

## POINT II:   ALL AS-APPLIED CLAIMS ARE UNRIPE

Because no Plaintiff challenges a "final decision" by the Village, their as-applied claims are not ripe for review. The PB never issued *any* decision on Ribiat's and Berger's site plan applications. And Horowitz, whose site plan application the PB *approved*, claims only that the BI is delaying issuance of a CO. None of these actions presents a ripe dispute.

"To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir.1993)). "A claim is not ripe if it depends upon 'contingent future events that may or may not occur as anticipated, or indeed, may not occur at all.'" *Walsh*, 714 F.3d at 687 (quoting *Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 580–81 (1985)); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) ("The ripeness requirement prevents a federal court from entangling itself in abstract disagreements over matters that are

---

[13] Plaintiffs' claims against the ZBA and member Laurie DiFrancesco are especially specious; no Plaintiff ever appeared before the ZBA. The only allegations against DiFrancesco relate to her actions as a private citizen and as a member of the CMPRC, which, like the CDRC, is an advisory committee and not capable of state action. Similarly, Plaintiffs identify no official action by Philip Gigante that violates the constitution. Thus, Plaintiffs' claims against DiFranceso and Gigante fail because Plaintiffs' do not allege their "personal involvement" in a constitutional violation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

[14] Although Plaintiffs do not sue the individual defendants in their official capacities, *see* FAC ¶¶ 10, 12, 15, 17–21, such claims would be equally duplicative and dismissible since they "represent only another way of pleading an action against" the Village. *Monell v. NYC Dep't. of Social Servs.*, 436 U.S. 658, 691 (1978).

premature for review because the injury is merely speculative and may never occur, depending on the final administrative resolution.")

Land use claims are unripe until the government "has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, No. 17-647, 2019 WL 2552486 (U.S. June 21, 2019); *see also Osborne v. Fernandez*, No. 06-CV-4127CSLMS, 2009 WL 884697, at *5 (S.D.N.Y. Mar. 31, 2009) ("The types of injuries claimed by Plaintiffs—delay and bad faith in the processing of their application and loss of desired use of their property—are precisely the types of claimed injuries that require a final decision to become potentially cognizable."), *aff'd*, 414 F. App'x 350 (2d Cir. 2011).

"A final decision is 'a definitive position on the issue that inflicts an actual, concrete injury.'" *R-Goshen LLC v. Vill. of Goshen*, 289 F. Supp. 2d 441, 448 (S.D.N.Y. 2003), *aff'd,* 115 F. App'x 465 (2d Cir. 2004) (quoting *Williamson*, 473 U.S at 193). It "exists when a development plan has been submitted, considered and rejected by the governmental entity with the power to implement zoning regulations." *S & R Dev. Estates, LLC v. Bass*, 588 F. Supp. 2d 452, 461 (S.D.N.Y.2008). Even if a plan has been submitted and rejected, a claim is not ripe until the "property owner submit[s] at least one meaningful application for a variance." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir.2005). Plaintiffs bears the "high burden" of proving that the Court "can look to a final, definitive position from a local authority to assess precisely how they can use their property." *Id*. at 347. Plaintiffs fail to carry this burden.

No Plaintiff has received a final decision. Ribiat and Berger abandoned the site plan process before the PB even finished reviewing their plans. To the extent Berger bases his claims on the BI's December 2017 interpretation, he could appeal or seek a variance from that interpretation

before the ZBA. *See* Vill. Code § 210-154. And even if it were true—which it is not—that Horowitz is entitled to a CO but the BI is delaying issuance, such inaction is also appealable to the ZBA. *See Id*. ("Whenever the [BI] shall … fail to act or otherwise perform any of his duties and shall render a decision thereon, such decision shall be reviewable by appeal to the Zoning Board of Appeals from the [BI]'s decision.") Without a final decision, the Court lacks the "full record" necessary to evaluate Plaintiffs' as-applied claims. *Murphy*, 402 F.3d at 348

**POINT III:  NO STANDING FOR RELIGIOUS FREEDOM OR DUE PROCESS CLAIMS RELATING TO THE MORATORIUM OR 2018 CODE**

No plaintiff submitted any proposal, applied for any permit, or engaged in any other conduct that implicated or invoked the Moratorium or 2018 Code. Thus, as to those laws, Plaintiffs lack standing for their Section 1983 free exercise, free speech, or free association and due process claims, RLUIPA substantial burden and exclusion-and-limits claims, and FHA claim.

"A federal court's authority to adjudicate depends on whether the plaintiff has standing to pursue its claims." *Cong. Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83, 109 (2d Cir. 2019) ("*Tartikov IV*"). "To satisfy Article III standing, '[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 92 (2d Cir.). "An injury in fact sufficient to confer standing is 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Tartikov IV*, 945 F.3d at 109 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

In *Tartikov IV*, the Second Circuit found a congregation hoping to build a rabbinical college lacked standing to pursue free exercise, free speech, and free association claims, as well as RLUIPA substantial burden and exclusions-and-limits claims and FHA claims, because the

rabbinical college "never submitted a formal proposal for the building project, applied for a permit, or engaged in any other conduct that would implicate or invoke the operation of the challenged zoning laws." *Id.* at 110. Thus, the Second Circuit reasoned, "[w]hatever harm may arise from the application of the zoning laws to [the congregation's] property is merely conjectural." *Id.*

Here, as to the Moratorium and 2018 Code, Plaintiffs lack standing for their Section 1983 free exercise, free speech, or free association and due process claims, RLUIPA substantial burden and exclusion-and-limits claims, and FHA claim, as no Plaintiff took any action to implicate or invoke either law. The PB continued to hear the applications of Ribiat and Berger while the Moratorium was in effect. ¶¶ 103–04, 114–15, 131; Exs. O, Q, R, S, T, U, CC. The PB approved Horowitz's application nearly two years before the Moratorium took effect, and he does not—and cannot—claim the law prohibited issuance of a CO. In any event, LL 1-2017 permitted property owners to apply to the VB for administrative relief from the Moratorium. *Id.*, § 4. Tellingly, no Plaintiff applied for exemption. And no Plaintiff has applied for site plan approval under the 2018 Code. Neither Ribiat nor Berger has returned to the PB to seek approval of their prior proposals, nor have they appealed to the ZBA for a variance from the 2018 Code. As a result, "[w]hatever harm may arise from the application of the zoning laws to [Plaintiffs'] property is merely conjectural at this time." *Tartkiov IV*, 945 F.3d at 110; *see also Cent. UTA of Monsey v. Vill. of Airmont, New York*, No. 18 CV 11103 (VB), 2020 WL 377706, at *11 (S.D.N.Y. Jan. 23, 2020) (no standing to challenge moratorium where plaintiffs never "applied for an exception to the moratorium"); *MacPherson v. Town of Southampton*, 2013 WL 6058202, at *17 (E.D.N.Y. Nov. 14, 2013) ("Plaintiffs ... do not have standing to bring their due process claims because they do not claim that they applied for rental permits to rent their properties and that they were denied said permits pursuant to the rental laws' provisions.").

**POINT IV:  FACIAL CHALLENGES TO 2007 CODE AND MORATORIUM ARE MOOT**

Plaintiffs' facial challenges to the expired 2007 Code and moratorium no longer present a live "case or controversy" and should be dismissed as moot.

"Mandated by Article III's 'case or controversy' requirement, the mootness doctrine prevents federal courts from hearing matters that no longer present an actual dispute between parties." *Assoc. Gen. Contractors of Conn., Inc. v. City of New Haven*, 41 F.3d 62, 65 (2d Cir. 1994). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "Constitutional challenges to statutes are routinely found moot when a statute is amended." *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 61 (2d Cir. 1992); *see also Assoc. Gen. Contractors, Inc.*, 41 F.3d at 65–66 (case mooted by expiration of the statute). "[D]eference to the legislative body's decision to amend is the rule, not the exception." *Harrison & Burrowes Bridge Constructors,* 981 F.2d at 61.

The 2007 Code and the Moratorium expired when the Village adopted the 2018 Code. Thus, whether the 2007 Code—which was nearly identical to the Amendments Stipulation—or the Moratorium were facially valid is no longer a live issue.

**POINT V:   PLAINTIFFS' RLUIPA AND § 1983 CLAIMS FAIL**

**A.  No Alleged Substantial Burden on or Exclusion of Religious Exercise or Restriction on Freedom of Association (Claims 1, 5, & 6)**

"[T]o establish a prima facie violation of [42 U.S.C. § 2000cc(a)(1)], a plaintiff must show that the land use regulation at issue as implemented: (1) imposes a substantial burden, (2) on the religious exercise, (3) of a person, institution, or assembly." *Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury,* No. 09–CV–5195, 2012 WL 1392365, at *7 (E.D.N.Y. Apr.23, 2012). To state a First Amendment free exercise claim, plaintiffs must allege the

24

government imposed "a substantial burden on the observation of a central religious belief or practice." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 79 (2d Cir. 2001). For a freedom of association claim "[t]o be cognizable, the interference with associational rights must be direct and substantial or significant," not simply making it "more difficult" for Plaintiffs "to exercise their freedom of association." *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996).

A substantial burden exists "when an individual is required to 'choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand.'" *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (*quoting Sherbert v. Verner,* 374 U.S. 398, 404 (1963)). "The burden must have more than a minimal impact on religious exercise, and there must be a close nexus between the two." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 219 (2d Cir. 2012).

"Among the types of burdens courts have found to be minimal, and hence not protected by RLUIPA, are facially neutral permit and variance requirements." *Cong. Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 431–32 (S.D.N.Y. 2015) ("*Tartikov II*"). "[Z]oning ordinances that merely require religious institutions to go through a routine permit or variance application process do not run afoul of RLUIPA." *Id.* (*citing Fortress Bible,* 694 F.3d at 219 ("denial of a religious institution's building application is likely not a substantial burden if it leaves open the possibility of modification and resubmission."); *Konikov v. Orange Cty.,* 410 F.3d 1317, 1323 (11th Cir. 2005) ("[R]equiring applications for variances, special permits, or other relief provisions [does] not offend RLUIPA's goals."); *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1035–36 (9th Cir. 2004) (requiring plaintiff to refile a "complete" permit application not a substantial burden); *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761–62 (7th Cir. 2003) ("CLUB") ("the scarcity of affordable land available for

development in R zones, along with the costs, procedural requirements, and inherent political aspects of the Special Use, Map Amendment, and Planned Development approval processes" did not impose substantial burden on religious institutions); *Roman Catholic Bishop of Springfield v. City of Springfield,* 760 F.Supp.2d 172, 187 (D. Mass. 2011) (routine application process did not violate RLUIPA), *vacated in part on other grounds,* 724 F.3d 78 (1st Cir. 2013); *Hale O Kaula Church v. Maui Planning Comm'n,* 229 F.Supp.2d 1056, 1071 (D. Haw. 2002) (requiring special use permit did not impose a substantial burden on religious institution).

"Indeed, to exempt religious institutions from the normal permit/variance process would result in favoring these institutions, something which neither RLUIPA nor the Free Exercise Clause more generally require (and which the Establishment Clause might prohibit)." *Tartikov II,* 138 F. Supp. 3d at 431–32 (*citing CLUB,* 342 F.3d at 762 ("Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations.... [N]o such free pass for religious land uses masquerades among the legitimate protections RLUIPA affords to religious exercise.")).

Plaintiffs' allegations amount to no more than frustration with a routine land use review procedure. While they decry the Village's site plan review procedure as "needlessly prolonged" and "completely arbitrary," their rage rings hollow. ¶ 16. The RPW application procedure of the 2007 Code—based on a procedure the Justice Department agreed to on a "test case" basis under the Amendments Stipulation—was designed to facilitate the establishment of RPW. Ex. B. And that procedure—effectively identical in the 2018 Code—is merely a codification of the powers vested in a Village by law to regulate land use. *See* N.Y. Vill. Law § 7-725-a(2) (PB may "review and approve, approve with modifications or disapprove site plans, prepared to specifications set

forth in the local law and/or in regulations of such authorized board."). Under state law:

> [s]ite plans shall show the arrangement, layout and design of the proposed use of the land on said plan. The local law shall specify the land uses that require site plan approval and the elements to be included on plans submitted for approval. The required site plan elements which are included in the local law may include, where appropriate, those related to parking, means of access, screening, signs, landscaping, architectural features, location and dimensions of buildings, adjacent land uses and physical features meant to protect adjacent land uses as well as any additional elements specified by the village board of trustees in such local law.

*Id*. These requirements apply across the board, including to places of religious worship—churches and synagogues must get site plan approval, too. Plaintiffs cannot plausibly maintain this standard site plan review process substantially burdens their religious practices, particularly where no Plaintiff (except one who was *approved*) has seen the process through to the end.

Equally misguided is Plaintiffs' constitutional challenge to the Village's imposition of criminal penalties for zoning code violations. A "Village is authorized under its home rule powers to provide for both civil and criminal penalties for violation of local zoning laws." 2004 N.Y. Op. Att'y Gen. No. 14 (Dec. 21, 2004) (*citing* N.Y. Mun. Home Rule Law § 10(4)(b) (permitting a municipality to prescribe that violations of its local laws constitute misdemeanors and lesser offenses, "and to provide for the punishment of violations thereof by civil penalty, fine, forfeiture or imprisonment, or by two or more of such punishments."). And in any event, Horowitz—the only Plaintiff whom the Village actually prosecuted for Code violations—does not provide any factual basis to suggest how the Village substantially burdened his religion.

Plaintiffs' attack on certain changes in the 2018 Code is equally unavailing. The Village's alleged failure to "grandfather" pending site plan applications is rooted in long-established state common law principle that land use applications "must be decided upon the law as it exists at the time of the decision … regardless of any intervening amendments to the zoning law."). *Rocky*

27

*Point Drive-In, LLP v. Town of Brookhaven*, 21 N.Y.3d 729, 736 (N.Y. 2013). And their reference to 2018 Code's classification of RPA as a "special use" rather than "by right" is a red herring. Though the use was technically reclassified, the applications still go through the same site plan review procedure. The reclassification causes no additional burden, much less a substantial one. Finally, Plaintiffs' claim that the 2018 Code "prohibits public baths" and thus "has the effect of banning mikvahs in Airmont" is false. ¶ 72. The provision Plaintiffs cite provides only, "[f]acilities such as public baths, schools, and classrooms shall be deemed separate uses and are not permitted *in an accessory residential place of assembly*." 21-12.1(B)(5) (emphasis added).

## B. No Alleged Violation of RLUIPA "Exclusions and Limits" (Claim 4)

Plaintiffs' claim that the Village violated 42 U.S.C. § 2000cc(b)(3)(A) by making it "unduly burdensome, if not impossible, to congregate in their homes for religious purposes" is a nonstarter; the 2007 and 2018 Codes explicitly permit such use. ¶ 230.

"No government shall impose or implement a land use regulation that … totally excludes religious assemblies from a jurisdiction." 42 U.S.C. § 2000cc(b)(3)(A). "The purpose of this provision is not to examine the restrictions placed on individual landowners, but to prevent municipalities from broadly limiting where religious entities can locate." *Cong. Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F. Supp. 2d 574, 637 (S.D.N.Y. 2013) (*Tartikov I*).

Neither the 2007 nor 2018 Codes "totally excluded" or otherwise limited the right of Village residents to gather in their homes for worship. To the contrary, both Codes permit such use in all residential zones. Ex. F, §210-12; Ex. C, § 210.12. The Village *approved* Horowitz's application for this use. Plaintiffs' "exclusions and limits" claim is baseless.

## C. No Alleged Violation of RLUIPA "Equal Terms" (Claim 2)

Plaintiffs fail to state an "equal terms" RLUIPA claim because they do not plausibly allege

the Village treats religious institutions on less than equal terms than with secular assemblies or institutions. And even if they did, Plaintiffs' failure to identify any secular comparators that have received better treatment is fatal to their claim.

RLUIPA's "equal terms" provision provides "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). "There are four elements of an Equal Terms violation: (1) the plaintiff must be a religious institution; (2) subject to a land use regulation; that (3) treats the religious institution on less than equal terms; with (4) a nonreligious institution." *Tartikov I*, 915 F. Supp. 2d at 634. Determining whether a municipality has treated a religious entity "on less than equal terms" requires a comparison between that religious entity and a secular one. *Third Church of Christ, Scientist, of New York City v. City of New York*, 626 F.3d 667, 669 (2d Cir. 2010).

Plaintiffs do not—and cannot—plausibly allege either the 2007 Code or the 2018 Code treats religious institutions on less than equal terms than secular assemblies or institutions in the site plan review procedure. In reality, since 2007, the Village has applied its general site plan review procedure to all applications for residential gathering places. Ex. F, § 210-12.1(B)(1). If anything, both versions of the Zoning Code favor religious use by giving priority in the scheduling of agenda items and the rendering of decisions. *Id*., § 210-12.1(B)(12); Ex. C, § 210-12.1(B)(14).

Moreover, Plaintiffs fail to support their claim with secular comparators that the Village treated more favorably. They name eight properties—including a non-secular church—but offer no factual allegations regarding the alleged use of these properties. ¶ 180. They fail to allege a plausible "equal terms" claim. *See Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*, 128 F. Supp. 3d 566, 588 (E.D.N.Y. 2015) (dismissing "equal terms" claim where

the comparators "were evaluated under different sets of criteria" and the plaintiff failed "to articulate how [his property] could be viewed as roughly equivalent to [the comparators]."

### D.  No Discrimination in the Site Plan Review Process (Claims 3 & 8)

Plaintiffs' discrimination claims under RLUIPA and the Equal Protection Clause fail because they neither identify similarly situated comparators nor plausibly allege improper motive.

Courts look to Equal Protection precedent to analyze RLUIPA "nondiscrimination" claims. *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 198 (2d Cir. 2014). The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439 (1985). To state a claim, plaintiffs must allege (a) they were selectively adversely treated compared with others similarly situated and (b) the selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Okoh v. Sullivan*, 441 F. App'x 813, 814 (2d Cir. 2011). "Courts within this Circuit have held that individuals are similarly situated for purposes of selective enforcement claims when they are similarly situated in all material respects." *Wright v. Nypd Officer Michael Manetta*, No. 14-CV-8976 (KBF), 2016 WL 482973, at *3 (S.D.N.Y. Feb. 5, 2016). "[W]here a plaintiff claims to have been treated unfairly in a zoning/building context, he must plead specific examples of applications and hearings that were similar to plaintiff's application and demonstrative of the disparate treatment alleged." *Amid v. Vill. of Old Brookville*, No. CV 11-3800, 2013 WL 527772, at *6 (E.D.N.Y. Feb. 7, 2013).[15]

Plaintiffs do not claim the Village has treated any similarly situated comparators more

---

[15] Although the Second Circuit has not defined "the exact parameters of the religious assemblies or institutions that may properly serve as comparators" for RLUIPA "nondiscrimination" claims, *Chabad Lubavitch*, 768 F.3d at 200 n.13, the comparators must "exhibit *some* similarity to permit meaningful analysis." *Id*. at 199 (emphasis added).

favorably, i.e., that it has allowed other public gathering places to operate without site plan review and approval. In a single paragraph, Plaintiffs purport to identify eight "comparators" that "have comparable or more community impact" than RPW. ¶ 180. But Plaintiffs fail to allege any facts to suggest these properties are similar to theirs, much less similar "in all material respects." And Plaintiffs do no—and cannot—allege the Village did not require these properties to go through the site plan approval process. With no comparators, Plaintiffs' discrimination claims fail.

Moreover, the FAC contains no plausible allegation to show any Village official acted with discriminatory intent. In place of these necessary facts, Plaintiffs merely repeat their baseless claim that each official acted pursuant to the Village's "custom and policy" of anti-Hasidism. Such conclusory allegations cannot withstand dismissal. *See Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 464 (2d Cir. 2006) (dismissing Equal Protection claim where "the only allegation of … discrimination is conclusory."); *Ruston v. Town Bd. for Town of Skaneateles*, No. 5:06-CV-927(FJS/GHL), 2009 WL 3199194, at *7 (N.D.N.Y. Sept. 30, 2009), *aff'd*, 610 F.3d 55 (2d Cir. 2010) (dismissing claim where plaintiff "only alleged conclusory statements of animus.")

### E.  No Due Process Claim (Claim 7)

Plaintiffs' claim that the Village violated their due process rights by "denying or refusing to approve" their land-use applications fails as a matter of law. The Village wields wide discretion in deciding those applications, so no Plaintiff can allege the Village deprived them of any property interest, much less that it did so in a conscience-shocking manner or without an opportunity to be heard. Their failure to exhaust administrative remedies also bars any procedural due process claim.

"While Section 1983 is often used as a vehicle to challenge local land use decisions, federal judicial review of decisions in such matters is extremely deferential." *Overhoff v. Ginsburg Dev., L.L.C.*, 143 F.Supp.379, 386 (S.D.N.Y. 2001). Federal courts do not sit as zoning boards of appeal

over local zoning decisions; nor are they to be substituted for state courts as adjudicators of the meaning of zoning and other land use regulations. *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). "[T]he Due Process Clause does not function as a general overseer of arbitrariness in state and local land-use decisions; in our federal system, that is the province of the state courts." *Lamar Adver. Of Penn LLC v. Pitman*, 573 F. Supp. 2d 700, 707 (N.D.N.Y. 2008).

   *1. No Property Interest*

   To allege either a substantive or procedural due process claim, Plaintiffs must allege a federally protectable property interest. *Missere v. Gross*, 826 F. Supp. 2d 542, 556 (S.D.N.Y. 2011). "The issue of whether a protected property interest exists is a matter of law for the court to decide." *Vertical Broad, Inc. v. Town of Southampton*, 84 F. Supp. 2d 379 391 (E.D.N.Y. 2000) (*citing RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989)).

   A protected property right exists only when a plaintiff can show a clear entitlement to the relief sought. *Id.* (*citing Natale*, 170 F.3d at 263); *Petruso v. Schlaefer*, 312 F. App'x 397, 399-400 (2d Cir. 2009). "Such a claim does not arise from the Constitution, but rather from an independent source such as state or local law." *Witt v. Vill. of Mamaroneck*, 992 F. Supp. 2d 350, 365-66 (S.D.N.Y. 2014). "[T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted." *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 59 (2d Cir.1985).

   No Plaintiff alleges a protectable property interest. Neither Ribiat nor Berger can allege a property interest in site plan approval because the PB has broad discretion to grant or deny. *See* Ex. F, § 210-74(B)(6); N.Y. Vill. Law § 7-725-a. Likewise, Horowtiz's claims fail because the issuance of a CO is a matter of discretion for the BI. Ex. F, § 210-149. Plaintiffs' due process

claims fail. S*ee e.g., Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 192 (2d Cir.1994) (landowners had no property interest in enforcement of zoning laws for adjacent property since municipal officials had broad discretion in determining whether to grant or deny building permit, site plan and variances); *RRI Realty Corp.,* 870 F.2d at 918–19 (no property interest existed in building permit since town officials had wide discretion to either grant or deny the permit); *Dean Tarry Corp. v. Friedlander,* 826 F.2d 210, 213 (2d Cir. 1987).

### 2.  *No Plausible Allegation of Conscience-Shocking Conduct*

Substantive due process "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official conduct actionable." *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005). Rather, "the scope of substantive due process is very limited." *Ahmed v. Town of Oyster Bay*, No. 12-CV-3654 (JFB)(WDW), 2014 WL 1092363, at *7 (E.D.N.Y. Mar. 18, 2014) (*citing Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). To plead a violation of a right to substantive due process, a plaintiff must allege government action "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Pena*, 432 F.3d at 112 (*quoting Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). Only "the most egregious official conduct" can be construed to violate the principles of substantive due process. *Cnty. of Sacramento*, 523 U.S. at 846; *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) (action must be "arbitrary, conscience shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised"). "The mere violation of state zoning laws is not sufficient to demonstrate conduct so outrageous as to violate the substantive component of the due process clause." *Vertical Broad, Inc. v. Town of Southampton*, 84 F. Supp. 2d 379, 391 (E.D.N.Y. 2000).

There are no plausible allegations of conscience-shocking action by any Village official. As the public records show, the Village processed Plaintiffs' application in accordance with its obligations under state and local law to regulate health and safety. Plaintiffs' repeated conclusory

allegations of an "unwritten policy" of anti-Hasidism are insufficient to create a claim. *See Scaccia v. Stamp*, 700 F. Supp. 2d 219, 240–41 (N.D.N.Y. 2010), *aff'd*, 447 F. App'x 267 (2d Cir. 2012) (dismissing claim based on "vague and conclusory insinuations of defendants' personal animus.")

### 3.  No Alleged Procedural Due Process Violation

Procedural due process requires only notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). Because no plaintiff alleges the Village deprived it of either notice or an opportunity to be heard, they state no any procedural due process claim.

Plaintiffs' claims also fail because they did not exhaust administrative remedies. No § 1983 action lies where adequate post-deprivation procedures exists, such as an Article 78 proceeding. *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996); *see also Montalbano v. Port Auth. of New York & New Jersey*, 843 F. Supp. 2d 473, 485 (S.D.N.Y. 2012). No plaintiff availed himself of post-deprivation procedure, so no plaintiff can state a claim.

## POINT VI:  PLAINTIFFS' FHA CLAIMS FAIL (CLAIM 9)

Plaintiffs' FHA claims—premised on their baseless allegation that the 2007 and 2018 Codes "make it nearly impossible for Hasidic Residents to construct a dwelling in accordance with their religious requirements" (¶ 265)—fail as a matter of law because they do not plausibly allege the Village has made housing "unavailable" to Hasidic residents.

The FHA makes it unlawful "[t]o refuse to sell or rent ... or otherwise make unavailable or deny a dwelling to any person because of" religion. 42 U.S.C. § 3604(a). Plaintiffs may pursue a theory of disparate treatment or disparate impact. *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 366 (2d Cir. 2003). To state a disparate treatment claim, Plaintiffs must allege "(1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *Mitchell v. Shane*, 350 F.3d 39, 47

(2d Cir. 2003). To state a disparate impact claim, Plaintiffs must allege "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (quotation omitted).

No Plaintiff can state a disparate treatment claim because none sought—much less was denied—housing. Nor can any Plaintiff state a plausible disparate impact claim because they fail to allege the Code results in "a significantly adverse or disproportionate impact on persons of a particular type." *Mhany Management, Inc.*, 819 F.3d at 617. Plaintiffs seem to premise their claim on the theory that the denial of an RPW application has the effect of making housing unavailable, but they do not—and cannot—allege the Village denied any of their applications for RPW. Indeed, only one Plaintiff has completed the site plan review procedure, and his application was *approved*. Plaintiffs offer no factual allegation to support their claim that either the 2007 Code or 2018 Code has made housing unavailable to Hasidic Jews.

## CONCLUSION

Defendants respectfully request this Court grant their motion and dismiss the FAC in its entirety with such other relief as this Court may deem just, equitable, and proper.

Dated: Carle Place, New York
      December 7, 2020

<div style="margin-left:40%">

SOKOLOFF STERN LLP
*Attorneys for Defendants*

Brian S. Sokoloff
Leo Dorfman
Alexander J. Eleftherakis
179 Westbury Avenue
Carle Place, New York 11514
(516) 334-4500
File No. 180175

</div>